Naseem Salman AL–HARBI,
Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 98–70828.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 16, 2000

Filed March 9, 2001

Philip Atkins–Pattenson, John D. Pernick, Jonathan P. Hersey, Sheppard, Mullin, Richter & Hampton, San Francisco, California, for the petitioner.

Terri J. Scadron, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington D.C., for the respondent.

Before: KLEINFELD, TASHIMA and BERZON, Circuit Judges.

BERZON, Circuit Judge:

In 1996 Naseem Salman Al–Harbi ("Petitioner") was brought by American forces to United States territory from northern Iraq, a refuge of Iraqi insurgents hostile to the reign of Saddam Hussein, as part of a massive evacuation effort led by United States government agencies. He wishes to remain here. We are charged with deciding whether he may.

## BACKGROUND

### A. *Al–Harbi's Testimony*

Al–Harbi, a twenty-nine-year-old Shia'a Muslim and a citizen of Iraq, testified as follows at his hearing before the Immigration Judge ("IJ"):[1]

In 1988, Al–Harbi was drafted by the Iraqi army. He deserted in 1990, prior to Iraq's invasion of Kuwait, and went to work for his uncle because his army wages were insufficient to support his family. In 1992, Petitioner rejoined the military after Hussein declared an amnesty for deserters. Upon reporting for duty, he and other deserters were taken to a police station. At the station, the police handcuffed and beat Al–Harbi while interrogating him about his activities during his desertion. After the interrogation Al–Harbi signed a document acknowledging that he would be executed if he opposed Hussein's regime or again deserted the military. He then rejoined his former unit in the army.

On October 15, 1995, Iraq held a presidential election in which Hussein was the only candidate. Al–Harbi and two friends secretly distributed flyers protesting what they deemed to be a sham election. The Iraqi secret service discovered what they were doing, however, and arrested Al–Harbi's two cohorts. After his friends were arrested, Al–Harbi fled to Irbil, located in northern Iraq, to avoid execution for opposing the government. In Irbil, he joined the Iraqi National Congress ("INC"), a political organization that seeks to replace Hussein and his government with a democratic regime. The INC assigned Al–Harbi the alias Zaman Sahib Hassan, and he served in Irbil as an INC guard from October 1995 until Hussein's forces invaded Irbil in August of 1996.

In the midst of the invasion, Al–Harbi and other INC members fled to Masif Salahiddin, a mountainous area in Kurdish northern Iraq, where they hid for fifteen days. From there, they were evacuated under Red Cross protection to Zakho, a town near the border of Iraq and Turkey. Al–Harbi and the other INC members remained in Zakho for forty-five days. Thereafter, U.S. military personnel evacuated them to Anjarlik, Turkey, and then airlifted them to Andersen Air Force Base in Guam.

When he arrived in Guam, Al–Harbi was interviewed by someone he took to be a member of the United States military, Raad Alkhakany. Alkhakany, who was fluent in Arabic, Petitioner's native language, prepared Petitioner's application for asylum and withholding of removal during the interview, using an INS Form I–589. In the application, Al–Harbi indicated that he worked with the Dawa political party, another group opposed to Hussein's regime, from 1988 to 1992, and for the INC from 1993 to 1996. The application also indicated that Al–Harbi had personally participated in the assassination of two Iraqi security officers while associated with the Dawa party.

Following his interviews in Guam with INS Asylum Officers and FBI agents, Al–Harbi was transferred to San Francisco, where the INS's Asylum Office referred his case to an IJ. The INS referral notice states that the INS did not grant his asylum claim because the "evidence indicate[d] [Petitioner] participated in the persecution of others."[2]

Al–Harbi's exclusion hearing, in which he was represented by counsel and testified through an Arabic translator, began on August 5, 1997. At the hearing, Petitioner made claims for asylum and withholding of removal on the basis of political opinion and religion.

---

1. There was also extensive independent documentary evidence, summarized below.

2. If the evidence in the record shows that an asylum applicant "participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion," the applicant is not eligible for asylum. *See* 8 U.S.C. § 1101(a)(42); 8 C.F.R. § 208.13(c)(2)(i)(E) (1996).

Al–Harbi initially testified that he had not been a member of the Dawa party and had not participated in the killings described in his asylum application. To explain the inconsistency between his I–589 form and his testimony, Al–Harbi insisted that he had told the officials who interviewed him in Guam only that during the 1992 interrogation incident the police had *accused* him of Dawa party membership and of the two shootings. Al–Harbi testified that he and the interpreters had difficulty understanding one another and that no one ever read his asylum application back to him in Arabic. Petitioner denied ever telling any U.S. official that he was in fact in the Dawa party or that he had killed anyone. He did admit, though, that, although he told the INS Asylum Officer that he had been arrested in 1995, he was in fact arrested in 1992. Petitioner repeatedly attributed the apparent misunderstandings surrounding these facts to difficulties he had in communicating with interpreters in Guam. Moreover, he maintained that the reason his I–589 form did not mention his protest of the 1995 presidential election was that Alkhakany had never asked him about such activities when he was filling out the form.

Paul Pierrot, an INS Asylum Officer, and John Peterson, an FBI agent, both of whom had interviewed Petitioner in Guam, each testified that Petitioner did not appear to be having translation problems during the interviews, and that Petitioner had clearly told them that he had been in the Dawa party and that he had participated in the killings. After Pierrot and Peterson testified, the hearing was continued to a third day.

On the third day of the hearing, Al–Harbi submitted another declaration, dated September 22, 1997, in which he recanted certain portions of his earlier testimony. In the declaration Petitioner stated that he had "concocted the story about killing two security guards in 1988," and that he wished to "tell the Judge what really happened in Iraq and explain why [he had] not told the truth...." He confessed that:

> [i]n the first days after arriving on Guam, an Iraqi who I trusted who had been in INC in Erbil [sic] with me advised me that he knew about Immigration matters and advised me that I had to convince the United States authorities that I was vehemently opposed to Saddam Hussein, so it would not be enough for me to describe my political work with the INC, but instead I needed to tell them I had killed someone from Saddam Hussein's government. That was why I told that story to the officials on Guam. Then, when I got to Bakersfield, I found out that another Iraqi, Rasheed Al–Alwani, (file A76 201 4770) had made up a similar lie, for similar reasons, and similar advice given, and he and I discussed our predicament.... We thought it would really look phoney if we both told the same reasons for why we had lied, so I decided to say I had been misunderstood in Guam by the officials on Guam due to the inaccurate interpreters.... When I turned myself in to the military in 1992, I was mistreated and detained-that is true-but I was *not* accused of any murders.... I believe my life and freedom are in danger if I return to Iraq. I have never killed anyone in my life and have never committed a crime.

Petitioner testified consistently with his new declaration on the third day of his hearing, and also retracted one other part of his earlier testimony. Petitioner had previously testified that at the end of the Gulf War, in March of 1991, a group of Iraqis opposed to Hussein's regime led an uprising ("Intifada") in Babyl Alhelia, the town where Petitioner lived after his first desertion from the army. The military shelled Babyl and other neighboring towns to put down the Intifada, and a number of the participants fled to Saudi Arabia. In the first day of his exclusion hearing (and in his July 30, 1997 declaration), Petitioner had claimed that he had participated in the

Intifada by distributing and posting flyers critical of Hussein's government and political party (the Ba'ath Party). During the third hearing day, however, Petitioner admitted that he had "made up" his involvement in the Intifada.

### B. *Other Evidence*

The record contains, in addition to Al–Harbi's testimony, a great deal of documentary evidence. Included among this evidence are two identification cards, one bearing Al–Harbi's photograph but a different name and attesting to his involvement in the Iraqi Broadcasting Corporation, and the other a Red Cross card bearing the same likeness and Al–Harbi's name and personal information. There is, in addition, extensive documentary information from newspapers, INC reports, State Department letters and other sources verifying that Hussein's forces invaded Irbil; that 100 INC members were executed; that INC members fled to Masif Salahiddin and then to Zakho; and that INC members and other Iraqi dissidents were evacuated from Zakho to Turkey and thence to Guam, as part of an American operation intended to rescue Iraqi dissidents, including INC members, after the invasion of Irbil. There is also documentary material asserting that the INC has been funded by the American government through the CIA. Finally, there are documentary sources, including an explicit threat in an Iraqi publication, indicating that the evacuees, if returned to Iraq, would be treated as traitors and, quite possibly, executed.[3]

### C. *INS Decisions*

In a written decision issued on September 26, 1997, the IJ found Petitioner ineligible for asylum and withholding of removal. The IJ entered an adverse credibility determination against Petitioner, finding that his "testimony is not worthy of credence in that he repeatedly changed his testimony at his convenience and only after confrontation with credible evidence elicited from government witnesses and documents." She concluded that:

> Applicant has not credibly established that he was a member of the INC, that he experienced past persecution based upon any of the protected bases, nor that he would be subject to future persecution based upon any of the protected bases. Further, Applicant has failed to meet his burden of proving by a preponderance of the evidence that he did not participate in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.

Petitioner appealed to the Board of Immigration Appeals ("BIA"), and filed a motion to remand and reopen his exclusion proceeding to consider additional evidence corroborating his membership in the INC. The Board affirmed the IJ in a brief order, holding that Petitioner had failed to establish either past persecution or a well-founded fear of persecution on account of one of the five grounds enumerated in section 101(a)(42) of the Immigration and Nationality Act. The BIA adopted the IJ's decision, affirmed "based upon and for the reasons set forth therein," and denied Petitioner's motion to remand because of the IJ's adverse credibility finding. The Board did not address the IJ's finding with respect to Petitioner's alleged persecution of others.[4] This petition for review followed. We affirm in part, reverse in part, and remand.

### STANDARD OF REVIEW

Where the BIA expressly adopts the IJ's findings and reasoning, as it did in this case, we review the decision of the IJ as if it were that of the Board. *Alaelua v.*

---

**3.** The documentary evidence is discussed in greater detail below. *See infra,* Part II.B.

**4.** In this Court, the INS has affirmatively waived the application of the persecution of others bar. Accordingly, we do not consider it here.

*INS*, 45 F.3d 1379, 1381–82 (9th Cir.1995). The substantial evidence standard of review governs adverse credibility findings, *Singh–Kaur v. INS*, 183 F.3d 1147, 1149 (9th Cir.1999), and all other factual findings. *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997); *Prasad v. INS*, 101 F.3d 614, 616–17 (9th Cir.1996). Under the substantial evidence standard, this Court must uphold the IJ's findings and conclusions if they are supported by "reasonable, substantial and probative evidence in the record." *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). To prevail, Petitioner must demonstrate that no reasonable factfinder could conclude that he is ineligible for relief from removal. *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir.1996) (en banc).

## DISCUSSION

### I. Background

■ The Attorney General has discretion to grant asylum to "refugees." 8 U.S.C. § 1158(a); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). A "refugee" is defined as someone who is unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Thus, an alien may establish eligibility for asylum based upon either past persecution or a well-founded fear of persecution. *See Velarde v. INS*, 140 F.3d 1305, 1309 (9th Cir.1998). A well-founded fear of persecution must be both "subjectively genuine" and "objectively reasonable." *Id.*

■ The objective component requires credible, direct and specific evidence of a well-founded fear. *See id.* A well-founded fear does not, however, require proof that persecution is more likely than not, *see Cardoza–Fonseca*, 480 U.S.

at 431, 107 S.Ct. 1207; even a ten percent chance of persecution may establish a well-founded fear. *See id.* at 440, 107 S.Ct. 1207; *Velarde*, 140 F.3d at 1310; *Montecino v. INS*, 915 F.2d 518, 520 (9th Cir. 1990). "[S]o long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." *Cardoza–Fonseca*, 480 U.S. at 440, 107 S.Ct. 1207.

■ To give rise to refugee status, persecution must be "on account of" one of the five statutorily-specified grounds. An alien may demonstrate that persecution was or would be on account of such a ground through inferences drawn from facts in evidence. *See id.* Persecution need not be solely on account of a protected ground, however, so long as it is motivated at least in part by one of those grounds.[5] *See Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir.1995). And a petitioner may establish a well-founded fear of persecution on account of a political opinion imputed to him by his persecutors, whether or not he actually holds that opinion. *See Vera–Valera v. INS*, 147 F.3d 1036, 1038 (9th Cir.1998).

■ Unlike asylum, withholding of removal is not discretionary. *See Barraza Rivera v. INS*, 913 F.2d 1443, 1449 (9th Cir.1990). The Attorney General is not permitted to deport an alien to a country where his "life or freedom would be threatened" on account of one of the same protected grounds that apply under the asylum statute. 8 U.S.C. § 1253(h). To qualify for withholding of removal, an alien must demonstrate that "it is more likely than not that he would be subject to persecution on one of the specified grounds." *INS v. Stevic*, 467 U.S. 407, 429–30, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). This "clear probability" standard, *id.* at 424, 104 S.Ct. 2489; 8 C.F.R. § 208.16(b), for with-

---

5. Although Petitioner originally pressed his claims on the basis of both political opinion

and religion, he has abandoned the latter ground in this court.

holding of removal is more stringent than the well-founded fear standard governing asylum. *See Cardoza–Fonseca,* 480 U.S. at 449–50. Accordingly, an alien who qualifies for a withholding of removal is necessarily eligible for a grant of asylum. *See Vera–Valera,* 147 F.3d at 1039; *Mendoza Perez v. INS,* 902 F.2d 760, 763 (9th Cir. 1990).

## II. Petitioner's Claims

### A. *Past Persecution*

Petitioner claims that he was persecuted on two occasions: first, during the 1992 interrogation, and second, when Hussein's forces invaded Irbil in August of 1996. Based on her adverse credibility finding, the IJ found that Petitioner failed to demonstrate that he was persecuted on either of these occasions. We affirm this aspect of the agency's ruling.

■■■ We have construed the term persecution to mean "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Singh v. INS,* 134 F.3d 962, 967 (9th Cir.1998). With respect to Petitioner's claim of past persecution based on the alleged 1992 police interrogation, apart from Petitioner's testimony and I–589 form, there is no evidence that the interrogation took place at all. Thus, the adverse credibility determination is fatal to this claim. Moreover, Petitioner's testimony does not establish any link between his alleged interrogation and beating and his actual or imputed political opinion. Although Al–Harbi originally claimed that he was beaten because of his involvement in the Babyl Intifada, in his exclusion hearing he ultimately disavowed any participation in that event. So, even were we to assume that the interrogation took place as described, it appears that any persecution was on account of his initial desertion from the military, not because of political activity or beliefs. Punishment on account of desertion generally does not support refugee status, unless it can be shown that such punishment is based on political opinion or another statutorily-protected ground. *See Barraza Rivera,* 913 F.2d at 1450.[6]

■■■ Petitioner's claim of past persecution arising from the Irbil invasion also fails because it depends entirely upon his own discredited testimony. We assume, though we need not decide, that Iraq's well-documented shelling of Irbil, forcing INC members stationed there to flee to Masif Salahiddin, constituted persecution.[7] *Cf. Desir v. Ilchert,* 840 F.2d 723, 726–27 (9th Cir.1988). Likewise, we assume, for purposes of decision, that the Iraqi military invaded Irbil because of the INC's anti-Hussein, pro-democratic sentiments.[8] But the only evidence we have in the record that Petitioner was in fact among those shelled in Irbil comes from his testimony, which the IJ found to be not credible. Because we must defer to the IJ's adverse credibility finding—a finding that

---

**6.** There is no evidence in the record to suggest that petitioner's first desertion was on account of his political beliefs. Thus, we need not consider whether, under *Rodriguez–Roman v. INS,* 98 F.3d 416 (9th Cir.1996), discussed *infra,* punishment inflicted for desertion would constitute persecution on the basis of Petitioner's political beliefs.

**7.** *See* AR 628 (Greg McDonald, *Clinton Says U.S. Doing All "We Can Do"; CIA-backed Operatives Seek American Aid to Get Out of Iraq,* Houston Chron., Sept. 10, 1996, at A14) (discussing attack on Irbil); AR 632 (*Human Rights Watch World Report 1997: Events of 1996,* at 289) (describing executions of INC members after invasion of Irbil); AR 635

(Terry Atlas, *U.S. Moves to Rescue Kurdish Outcasts, Tensions with Iraq Continue to Simmer,* Chicago Tribune, Sept. 13, 1996).

**8.** *See* AR 624 (*US Completes Evacuation of Iraqi Dissidents Into Turkey,* Agence France Presse, Oct. 20, 1996) (discussing Hussein's crackdown on INC "traitors"); AR 611 (statement of Madeleine Albright, then-U.S. Permanent Representative to the United Nations, before the Senate Subcommittee on Near Eastern and South Asian Affairs (Aug. 3, 1995)) (noting United States government's belief that the INC is "dedicated to a democratically based government in Iraq").

is amply supported by Al–Harbi's propensity to change his story regarding incidents of past persecution—we affirm the IJ's conclusion that Petitioner did not establish that he suffered past persecution on account of political opinion.

### B. *Well–Founded Fear of Persecution*

■ That Al–Harbi cannot show that he was persecuted in the past does not, however, necessarily defeat his application for asylum or withholding of removal. Rather, proof of a well-founded fear of future persecution if returned to Iraq will suffice. *See Velarde*, 140 F.3d at 1309. Al–Harbi maintains that if he is returned to Iraq, the Iraqi government will infer from his involvement in the American-led airlift a dissident or traitorous political opinion and will persecute him for that reason. We agree that the record admits of no other reasonable conclusion.

■ To establish a likelihood of persecution on account of an imputed political opinion, an applicant must show that his alleged persecutors have imputed or would impute a political opinion to him, "rightly or in error," and have persecuted or would persecute him for that opinion. *Sangha*, 103 F.3d at 1489–90.[9] As noted above, a well-founded fear of persecution has both subjective and objective elements of proof.

As to the subjective component, Al–Harbi testified that he feared execution in the event of his return to Iraq. We cannot rely on his testimony as establishing the subjective element, however, because the IJ and the BIA, with substantial basis in the record, found that the "applicant's testimony is not worthy of credence."

There was, however, documentary evidence in the record that all individuals who were evacuated to Guam at the same time as Al–Harbi genuinely entertained a subjective fear of persecution. *See* AR 613 (*INC Welcomes U.S. Evacuation of 600 Dissidents*, COMPASS Newswire (London), Oct. 24, 1996) (quoting State Department spokesman Nicholas Burns as saying, "[the October evacuees] are united in one respect.... They all oppose the regime of Saddam Hussein-so much so, and their activities were such, that *they all feared persecution or the risk of serious harm* to themselves or their families should they have stayed in Iraq") (emphasis added). Moreover, there is a great deal of evidence in the record, discussed below, that Petitioner is *in fact* likely to be subject to persecution, indeed is likely to be executed, should he return to Iraq. Most people are sensible enough to harbor a genuine fear of persecution if the actual likelihood of persecution is high. Because the strong evidence as to the objective component of a "well-founded fear of persecution" claim is therefore relevant in establishing Petitioner's subjective fear, "[t]o the extent that any question exists with respect to the genuineness of petitioner's fear, it is answered by our decision regarding the objective component."

---

9. While *Sangha* used the past tense ("actually imputed"), it is clear that a sufficient likelihood that prospective persecutors *will* impute a political opinion to the applicant, rightly or in error, and persecute the applicant for that opinion, also establishes a well-founded fear of persecution. *Sangha* relies on *Ramirez Rivas v. INS*, 899 F.2d 864 (9th Cir.1990), in which there was no proof that the persecutors had in fact imputed an opinion to the petitioner, but in which the court nevertheless "considered it likely that the persecutors [would] attribute the political views of others to the [petitioner]." *Sangha*, 103 F.3d at 1489 (citing *Ramirez Rivas*, 899 F.2d at 865–66). Moreover, a requirement that the imputation and persecution already have occurred would be at odds with the expressly disjunctive statutory phrasing of the definition of "refugee" in 8 U.S.C. § 1101, which requires an applicant to establish "persecution *or* a well-founded fear of persecution on account of ... political opinion." *Id.* § 1101(a)(42)(A) (emphasis added). Similarly, the statutory basis for withholding of removal does not require a showing of past persecution on account of political opinion. A petitioner instead has to show, as stated, that "it is more likely than not that he would be subject to persecution on one of the specified grounds." *Stevic*, 467 U.S. at 429–30, 104 S.Ct. 2489 (1984).

*Aguilera–Cota v. INS,* 914 F.2d 1375, 1378 (9th Cir.1990).

The principal question, then, is whether there is sufficient likelihood that Petitioner would be persecuted for political beliefs that his persecutors would impute to him that any fear of persecution he harbors is "well-founded." Petitioner must offer credible, direct, and specific evidence to show that his fear is objectively reasonable. *See Velarde,* 140 F.3d at 1309.

In light of the adverse credibility finding, we consider Petitioner's testimony on this issue only to point the way to areas of inquiry, and look for support only to the documentary material in the record. That material includes both documents specifically pertaining to the circumstances of Al–Harbi's journey to the United States and extensive background material concerning the Iraqi opposition and the circumstances of the American-led evacuation of opposition members from northern Iraq.

The former kind of evidence—documentary evidence pertaining to the asylum applicant himself and to the events in which he was involved—can independently establish facts essential to the objective element of an asylum claim. *Zahedi v. INS,* 222 F.3d 1157, 1163 (9th Cir.2000); *Aguilera–Cota,* 914 F.2d at 1379; *Blanco–Comarribas v. INS,* 830 F.2d 1039, 1042–43 (9th Cir.1987). Background materials—here, principally newspaper accounts of the events in northern Iraq and the airlift of Iraqi dissidents, as well as some State Department documents—can corroborate the specific documentary material and inform an understanding of its significance. *Zahedi,* 222 F.3d at 1163; *Duarte de Guinac v. INS,* 179 F.3d 1156, 1162 (9th Cir.1999).

First, substantial documentary evidence supports Al–Harbi's claim that he would be associated by the Iraqi regime with the American airlift of Iraqi dissidents to Guam, and assumed to be a dissident for that reason. It is undisputed that Petitioner left Iraq as part of an evacuation of INC members and other Iraqi dissidents,[10] that he made it through a checkpoint at the Turkish border through which only individuals whose names were on a list provided by INC headquarters in London were supposed to be allowed, *see* AR 624 (*U.S. Completes Evacuation of Iraqi Dissidents Into Turkey,* Agence France Presse, Oct. 20, 1996), and that he was then evacuated on the October airlift to Guam. Otherwise, as far as the record shows, Petitioner would not have been in the Guam holding area in October and November, 1996, as his asylum application and the INS and FBI interview forms show that he was.

The INS conceded at oral argument that, of the three different airlifts from Iraq in the fall of 1996, the October one was expressly for INC members. *See also* AR 613 (*INC Welcomes U.S. Evacuation of 600 Dissidents,* COMPASS Newswire (London), Oct. 24, 1996) (quoting State Department spokesman Nicholas Burns as saying, "[the October evacuees] are united in one respect.... They all oppose the regime of Saddam Hussein—so much so, and their activities were such, that they all feared persecution or the risk of serious harm to themselves or their families should they have stayed in Iraq"); AR 624 (*US Completes Evacuation of Iraqi Dissidents into Turkey,* Agence France Presse, Oct. 20, 1996) (noting that the October airlift of "Iraqi dissidents" involved "mainly members of the [INC]"); AR 615–16 (Patrick Worsnip, *U.S. to Evacuate Thousands More from Northern Iraq,* Reuters News Service, Nov. 25, 1996) (reporting

10. Al–Harbi contends that the documentary evidence in the record establishes that he is a member of the INC. While the record contains some documentary evidence supporting that conclusion, we need not decide whether that evidence compels the conclusion that Al–Harbi was in fact an INC member, because we conclude that he is entitled to withholding of removal on other grounds.

that October evacuation consisted of "600 Iraqi opposition figures"); AR 647 (Steven Lee Myers, *U.S. to Help Free Refugees in Iraq*, N.Y. Times, Sept. 13, 1996, at A1) (describing U.S. promise to evacuate INC members reaching the Turkish border).

Based on all these circumstances, even the representatives of the United States who processed Al–Harbi's initial asylum application assumed that Al–Harbi was an INC member, or was, at least, a dissident opposed to the Iraqi regime.[11] There is every reason to expect that the Iraqi government would so assume as well.

Indeed, the record establishes, through numerous news stories detailing the events leading up to the evacuation, American support for the INC, and the United States' promises of political asylum to the evacuees, that the connection between the INC, the United States, and the 1996 evacuation was widely reported. So the Iraqi government would have good reason to impute to the evacuees a dissident political opinion and a connection with the United States. *See, e.g.,* AR 605–06 (Kelly Couturier, *U.S.-Linked Iraqis to be Evacuated; Resistance Members to Be Flown to Guam,* Wash. Post, Oct. 19, 1996, at A21); AR 591 (Jonathan C. Randal, *200 Saddam Foes with CIA Links Fear for Lives,* Wash. Post, Sept. 9, 1996, at A1); AR 595 (R. Jeffrey Smith & David B. Ottaway, *Anti–Saddam Operation Cost CIA $100 Million,* Wash. Post, Sept. 15, 1996, at A1); AR 609 (Letter from Clarisa Bencomo, Research Associate, Iraq and the Gulf, Human Rights Watch, to Lynn Marcus, Director, University of Arizona College of Law Immigration Law Clinic 2 (Mar. 4, 1997)); AR 611 (statement of Madeleine Albright, then-U.S. Permanent Representative to the United Nations, before the Senate Subcommittee on Near Eastern and South Asian Affairs (Aug. 3, 1995)) ("[W]e do support an Iraqi opposition which is the Iraqi National Congress. We

support them politically and diplomatically. We believe they are dedicated to a democratically based government in Iraq...."); AR 643 (Sid Balman, Jr., *Turkey Opens Borders for Dissidents,* U.P.I. News Service, Sept. 11, 1996) (describing agreement between U.S. and Turkey to evacuate 2,500 "Iraqi dissidents ... who oppose Saddam," "who are fleeing to escape retribution from his forces," all of whom "[t]he [Clinton] administration said ... would receive political asylum in the United States if necessary"); AR 646 (Steven Lee Myers, *U.S. to Help Free Refugees in Iraq,* N.Y. Times, Sept. 13, 1996, at A1) (reporting "Clinton Administration [statement] today that the United States would help evacuate more than 2,000 refugees who had worked with its military and relief operations in northern Iraq and grant many of them asylum").

Second, there was no challenge to the substantial evidence in the record confirming the likely treatment upon deportation to Iraq of any individual associated with the Guam airlift. The record contains detailed and extensive support, entirely independent of Al–Harbi's own testimony, demonstrating that if Petitioner were returned to Iraq years after participating in the American airlift of Iraqi dissidents to Guam, he would likely be punished as a traitor.

Documentary evidence in the record demonstrates that Iraqi law permits the death penalty in cases of espionage, which is defined broadly to include "unauthorized contact with foreigners." AR 609 (Letter from Clarisa Bencomo, Research Associate, Iraq and the Gulf, Human Rights Watch, to Lynn Marcus, Director, University of Arizona College of Law Immigration Law Clinic 2 (Mar. 4, 1997)). The IJ also had before her evidence that Iraq punishes treason with death, and that after the evacuation, Hussein branded the evacuees as traitors. *See* AR 548 (Letter of

---

11. The agents recommended denying Al–Harbi's application for asylum, not because of any doubt that he was an Iraqi dissident, but

solely on the basis of the "persecution of others" bar, a ground which, as noted above, the government has abandoned here.

William M. Bartlett, Director, Office of Asylum Affairs, U.S. Department of State Bureau of Democracy, Human Rights and Labor, to Jeffrey Weiss, Director, Immigration and Naturalization Service Central Asylum Office, at 2 (Sept. 24, 1996)) ("[A]n Iraqi government decree of 1991 labels as 'traitors' any Iraqi citizen who collaborates with the multinational forces. Conviction as a traitor would almost certainly bring the death penalty."); AR 625 (*U.S. Completes Evacuation of Iraqi Dissidents into Turkey,* Agence France Presse, Oct. 20, 1996); AR 608 (Letter from Clarisa Bencomo, Research Associate, Iraq and the Gulf, Human Rights Watch, to Lynn Marcus, Director, University of Arizona College of Law Immigration Law Clinic 2 (Mar. 4, 1997)).

Third, there is direct confirmation in the record that Iraq may well regard all the evacuees as traitors, and persecute them. A column in the Iraqi newspaper *Babil* that Petitioner submitted to the IJ paints a frightening portrait of how those airlifted from Turkey would be punished for treason if returned to their homeland:

It has become known that a number of contemptible traitors in the North of our precious homeland, under the anomalous circumstances being experienced by this cherished part of the glorious towering Iraq of civilizations, as a result of foreign intervention, have fallen prey to treason through being used by the American Central Intelligence Agency. It is also known that American Intelligence moved the contemptible traitors whom they used, to the island of Guam in the Atlantic [sic] Ocean. Some were then taken to specific locations in the United States without allowing them to move about or travel. .... The removal of the traitors, the agents of the American Central Intelligence Agency, was not carried out in order to protect them as claimed by American Intelli-

gence sources. Rather, it was done to preserve their secrets.... It is laughable that ... there is now a possibility of being deported from the United States, accused of constituting a threat to American national security.... The curse of treason is upon them, and will continue to hound them in this life and the next; they will suffer every kind of anguish, causing them to curse the hour in which they became involved in betraying their people and their homeland.

AR 573–76 (Hamseed Sa'eed, "The Curse of Treason," *Babil,* May 15, 1997).

The short of the matter is that, as a letter from the State Department that was before the IJ unambiguously states: "It is [the Bureau's] belief that *the Iraqi individuals on Guam would be at great risk were they to return to their homes in Northern Iraq or anywhere else in Iraq.*" AR 548 (Letter of William M. Bartlett, Director, Office of Asylum Affairs, U.S. Department of State Bureau of Democracy, Human Rights and Labor, to Jeffrey Weiss, Director, Immigration and Naturalization Service Central Asylum Office, at 2 (Sept. 24, 1996)) (emphasis added). Based on the evidence in the record, no reasonable person could conclude other than that Petitioner would likely be persecuted upon return to Iraq based on political opinions that would be imputed to anyone involved in the American airlift.

The INS insists that any punishment Al–Harbi might endure upon his return to Iraq would be on account of his impermissible emigration from Iraq, and therefore not on the basis of imputed political opinion. We have explicitly recognized, however, that in certain circumstances, departure from one's country in violation of laws forbidding such departure may trigger persecution based on imputed political opinion. *See Rodriguez–Roman,* 98 F.3d at 429.[12] The unique circum-

---

12. Although *Rodriguez–Roman* concerned a *statutory* prohibition on illegal departure, the court did not limit the ambit of its holding to statutes, nor would such a limitation be consistent with the principles underlying that case. An asylum applicant may be deemed a

stances of this case make Al–Harbi's claim for relief significantly more compelling than that of the petitioner in *Rodriguez–Roman*. Rodriguez–Roman jumped ship and made his way unassisted to the United States. Al–Harbi left Iraq as part of a U.S. operation to save Iraqis opposed to Hussein's regime. Given that the BIA did not adopt the IJ's finding on the persecution-of-others bar, it would truly be a cruel twist of fate for U.S. officials to bring Al–Harbi here only to send him back to Iraq with the taint of having been on the Guam airlift, to face the likely possibility of torture and/or execution for his involvement in the U.S.-led operation.

There is, in short, substantial, non-testimonial, evidence in the record of the significant danger that Petitioner and others involved in the American airlift would face if deported to Iraq, evidence from which no reasonable person could conclude otherwise. Thus, Petitioner has established his entitlement to withholding of removal, and *a fortiori*, his eligibility for asylum. *See Vera–Valera*, 147 F.3d at 1039; *Mendoza Perez*, 902 F.2d at 763.

## CONCLUSION

Because the evidence in the record compels the conclusion that Petitioner is entitled to the relief he seeks, we GRANT the petition for review, REVERSE the decision of the BIA, and REMAND with instructions that Al–Harbi be granted withholding of removal and that the Attorney General exercise his discretion on whether Al–Harbi should be granted asylum.

refugee if he would be "subject to severe penalties for his illegal departure or unauthorized stay abroad." *Id.* at 426 (citing Office of United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status*, ¶ 61, at 16). This is true whether the penalties find their origin in a public law, an edict, or an

unwritten practice, so long as the persecutor "views persons who ... leave as disloyal and subversive." *Rodriguez–Roman*, 98 F.3d at 430.