# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FARANGIS NAJMABADI,
                    *Petitioner,*

          v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 05-72401

Agency No.
A072-439-437

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
November 5, 2009—Pasadena, California

Filed March 9, 2010

Before: Harry Pregerson, Jay S. Bybee and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Harry Pregerson

3681

## COUNSEL

Enrique Arevalo and Xavier Rosas, Law Office of Enrique Arevalo, South Pasadena, California, for petitioner Farangis Najmabadi.

Peter D. Keisler, Linda S. Wernery, and Angela N. Liang, United States Department of Justice, Office of Immigration Litigation, Washington, DC, for respondent Eric H. Holder Jr., United States Attorney General.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Petitioner, Farangis Najmabadi, a native and citizen of Iran, petitions for review of the Board of Immigration Appeals's (BIA or Board) order denying her motion to reopen her

removal proceedings on the basis of changed conditions in Iran. Because we hold that Najmabadi failed to introduce previously unavailable, material evidence, we deny her petition for review.

## FACTUAL AND PROCEDURAL BACKGROUND

Najmabadi was admitted to the United States on October 5, 1986, as a non-immigrant visitor with authorization to remain in the United States until April 5, 1987. On October 27, 1998, the former Immigration and Naturalization Service filed a notice to appear with the immigration court charging Najmabadi with removability. Najmabadi filed an asylum application on November 18, 1998.

On April 11, 2000, an Immigration Judge (IJ) conducted a removal proceeding, at which Najmabadi claimed that she left Iran due to its then war with Iraq. She stated that "there wasn't any particular reason" that she left Iran but rather "[e]verything changed, especially for a woman like me." Asked why she did not want to return to Iran, Najmabadi testified that she is "not sure if [she] can live there," and after sixteen years, knows the United States "now probably more than [her] country." Najmabadi further testified that she has never participated in any political rallies nor joined any political organizations. In addition, Najmabadi never had any problems in Iran prior to leaving. Rather, Najmabadi testified that she does not think she can "fit in" in Iran and fears returning to Iran because of the way women are treated.

The IJ denied Najmabadi's application. While the IJ found Najmabadi's testimony to be credible, he concluded that she had not established past persecution or a well-founded fear of future persecution. After the BIA affirmed, we denied the petition for review in an unpublished decision. *Najmabadi v. Ashcroft*, 107 F. App'x 98 (9th Cir. 2004). Relying on *Fisher v. INS*, 79 F.3d 955, 962-63 (9th Cir. 1996) (en banc), we rejected Najmabadi's claim that she has a well-founded fear

of future persecution "based on her refusal to conform to the social norms of Iran if returned to that country." *Najmabadi*, 107 F. App'x at 100.

On December 14, 2004, Najmabadi filed a petition to reopen based on changed circumstances in Iran. In her motion to reopen, Najmabadi argued that the relationship between Iran and the United States changed significantly after September 11, 2001. She pointed to ties between Iran and terrorist organizations; Iran's nuclear arms capabilities; tension between Iran and the United States stemming from the war in Iraq; and "generalized strife" including an Iranian governmental backlash to Iran's reform movement. With respect to this last category, Najmabadi referred to the following: State Department reports citing the worsening of Iran's human rights record from 2000 to 2003; evidence that a group of 50 women were lashed for listening to loud music; election of "hard liners"; the denouncement of an Iranian woman who won the Nobel Prize; torture of student activists as a means of suppressing dissent; a crackdown on the release of information over the Internet; the reported arrest of the editor of a women's rights journal; and greater restrictions on women's attire and social freedoms. Najmabadi also submitted a renewed asylum application and accompanying affidavit. In her affidavit, Najmabadi claims: the Iranian government would perceive her as being "pro-U.S. and pro-Western"; she "do[es] not agree with how the government treats their women and people in general"; and she "will be active in trying to change Iran and the situation for women."

On March 31, 2005, the BIA denied Petitioner's motion to reopen, concluding that Najmabadi did not establish changed circumstances. Relying on our decision in *Malty v. Ashcroft*, 381 F.3d 942 (9th Cir. 2004), the BIA held that while the evidence that Najmabadi submitted "establish[es] that the situation in Iran continues to be deplorable, and that tensions with the United States appear to be increasing[,]" it does not "establish a level of change that is linked to [Najmabadi's] par-

ticular circumstances." The BIA noted that the record at the time of Najmabadi's original hearing contained the 1999 Country Reports on Human Rights Practices, which listed "systemic abuses . . . includ[ing] extrajudicial killings, summary executions, disappearances, widespread use of torture and other degrading treatment (including rape), and arbitrary arrest and prolonged detention." The BIA characterized Najmabadi's evidence as describing "general conditions which affect the population at large[,]" and held that this evidence was "in evidence at the prior hearing." Finally, the BIA held that there was no evidence, which fell "outside the realm of speculation," that established "returnees from the United States will likely face persecution."

## JURISDICTION AND STANDARD OF REVIEW

We review denials of motions to reopen for abuse of discretion, *Toufighi v. Mukasey*, 538 F.3d 988, 992 (9th Cir. 2008), and defer to the BIA's exercise of discretion unless it acted arbitrarily, irrationally, or contrary to law, *Singh v. INS*, 295 F.3d 1037, 1039 (9th Cir. 2002). We review the BIA's determination of purely legal questions de novo, and review its factual findings for substantial evidence. *Bhasin v. Gonzales*, 423 F.3d 977, 983 (9th Cir. 2005). Finally, "[o]ur review is limited to the actual grounds relied upon by the BIA." *Ramirez-Altamirano v. Holder*, 563 F.3d 800, 804 (9th Cir. 2009).

## DISCUSSION

### A.   Standards Governing Motions to Reopen

**[1]** Generally, a party wishing to file a motion to reopen must do so within ninety-days. 8 C.F.R. § 1003.2(c)(2). However, the ninety-day time limit does not apply where the motion to reopen is "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was

not available and could not have been discovered or presented at the previous hearing." *Id.* § 1003.2(c)(3)(ii). The BIA can deny a motion to reopen on any one of "at least" three independent grounds—"failure to establish a prima facie case for the relief sought, failure to introduce previously unavailable, material evidence, and a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought." *INS v. Doherty*, 502 U.S. 314, 323 (1992). The Supreme Court has instructed that "[t]he granting of a motion to reopen is . . . discretionary, and the Attorney General has 'broad discretion' to grant or deny such motions." *Id.* (internal citations omitted).

## B. Denial Based On Previously Unavailable, Material Evidence

**[2]** The BIA considered Najmabadi's motion to be "premised on the fact that circumstances in Iran have significantly declined since her hearing, and as a result she has a viable claim of persecution based on direct and imputed political opinion, and the fact that she is a 'westernized woman.' " The BIA held that the evidence submitted by Najmabadi in her motion to reopen, which established the existence of torture and punishment for dissenters, was in evidence at the prior hearing. It explained that the evidence addressed general conditions affecting the population at large, and was not linked to Najmabadi's "particular circumstances." It also noted that there was no evidence, which fell "outside the realm of speculation," that established that "returnees from the United States will likely face persecution." Thus, the BIA based its denial of Najmabadi's motion to reopen on the second ground articulated above—Najmabadi's failure to introduce previously unavailable, material evidence. As we must, we limit our review to these grounds. *See Ramirez-Altamirano*, 563 F.3d at 804.

### 1. Qualitatively Different Evidence

**[3]** In *Malty v. Ashcroft*, we held that in order for evidence to be "material," "not available," and not able to have "been

discovered or presented at the previous hearing," it must be "qualitatively different" from the evidence presented at the previous hearing. 381 F.3d at 945-46; *see also* 8 C.F.R. § 1003.2(c)(1) ("A motion to reopen proceedings shall state the *new facts* that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material." (emphasis added)). Relying primarily on *Malty*, Najmabadi argues that the Board abused its discretion in finding that her evidence was not materially distinct from the evidence at her original hearing, because her "new" evidence is qualitatively different. We therefore describe *Malty* in some detail.

In *Malty*, an Egyptian Coptic Christian filed an application for asylum and withholding of removal in 1992. 381 F.3d at 944. At the asylum hearing, he testified that he had been taunted while in high school by Islamic teachers and classmates due to his Christianity. *Id.* He was forced to finish college from home, and was unable to find employment as a result of religious discrimination. *Id.* He also testified that "he and his family received menacing telephone calls from Islamic militants." *Id.*

After the immigration judge denied his petition and the BIA affirmed, we denied his petition for review. *Id.* Malty then filed a motion to reopen based on changed circumstances in Egypt. *Id.* Along with his motion to reopen, Malty submitted evidence "detailing rising levels of violence against Egyptian Coptic Christians generally and *specific acts of violence against his family in particular*." *Id.* (emphasis added). Those acts included "a series of brutal attacks" against members of Malty's family, including his father, all occurring after Malty's original asylum hearing. *Id.* In addition, Malty's father had been subsequently "warned of consequences Malty would face if he returned." *Id.*

We held that Malty's evidence accompanying his motion to reopen was " 'material and was not available and could not

have been discovered at the previous hearing.' " *Id.* at 945 (quoting 8 C.F.R. § 1003.2(c)(3)(ii)). We faulted the BIA for not recognizing that the evidence presented along with his motion to reopen was "qualitatively different" from his previous evidence, and for narrowly focusing on the fact that the new evidence was simply related to the petitioner's initial claim. *Id.* We explained that the evidence Malty had presented at his asylum hearing did little more than describe incidents of harassment and discrimination. *Id.* However, Malty's new evidence showed that the "harassment had increased to the level of persecution, both with respect to Coptic Christians generally *and with respect to Malty's family specifically.*" *Id.* at 946 (emphasis added).[1]

Malty's "new" evidence consisted first of a 1999 "Freedom House Report," which described "mass arrests and torture . . . of Egyptian Coptic Christians, murders of numerous Coptic

---

[1]In arguing that Najmabadi has shown changed circumstances, the dissent simply recites *Malty*'s observation that "a 'petitioner's evidence regarding changed circumstances will almost always relate to his [or her] initial claim.' " Dissent at 3702 (quoting *Malty*, 381 F.3d at 945). Indeed, that observation is obvious. A motion to reopen asks the Board to reopen a case in which it has previously rendered a decision. In requesting that the Board reopen the case, the petitioner will often seek relief on the same grounds alleged in the original petition. Yet the dissent ignores that while the "new" evidence a petitioner includes in the motion to reopen *necessarily* relates to the initial claim, its relation to the initial claim is not *sufficient* to amount to "material" evidence. For example in *Malty*, the BIA had described the evidence presented along with the motion to reopen as merely "a continuance of the circumstances that gave rise to [the petitioner's] first claim." *Malty*, 381 F.3d at 945 (internal quotation marks omitted). We explained that the BIA had incorrectly framed the issue since "[t]he critical question is not whether the allegations bear some connection to a prior application, but rather whether circumstances have changed *sufficiently* that a petitioner who previously did not have a legitimate claim for asylum now has a well-founded fear of future persecution." *Id.* (emphasis added). In order to determine whether the petitioner demonstrated a *sufficient* change in circumstances, we assessed the materiality of Malty's new evidence and held it to be "qualitatively different from the evidence presented at his asylum hearing." *Id.*

Christians on account of religion, and the arrest of the Secretary-General of the Egyptian Organization for Human Rights[.]" *Id.* (internal quotation marks omitted). It also described the growth of *jiyza*, a tax Christians were forced to pay to avoid violent attacks. *Id.* Malty also submitted a detailed declaration describing separate incidents of persecution of his family members in Egypt. *Id.* For example, that declaration described that Malty's brother had been arrested, interrogated, beaten, burnt with cigarettes and subjected to electrical shocks by interrogating officers. *Id.* Malty's father had also been attacked by Islamic militants, who destroyed his business. *Id.* Malty's brother was later beaten, at which time his attackers told him that "they were going to kill all infidels like him." *Id.* (internal quotation marks omitted). The police refused to investigate each of these attacks. *Id.* Malty's father was threatened by people aware of Malty's asylum application and told that if Malty returned to Egypt he would be arrested and prosecuted. *Id.* On the Coptic Christmas Eve, Malty's family's apartment was ransacked, and later his father again attacked, this time for failing to pay *jizya*. *Id.*

We had little trouble concluding that evidence of "menacing telephone calls" and high school "taunts" is "qualitatively different" from that of "mass arrests and torture" and the kinds of horrific events described in Malty's declaration. Najmabadi's petition does not persuade us to reach the same conclusion.

At her asylum hearing, Najmabadi submitted the 1999 Country Reports on Human Rights Practices on Iran (the 1999 Report). The 1999 Report described Iran's human rights record as "poor," and detailed "serious problems" in Iran's human rights policies. For example, it included the following information about life in Iran:

> Paramilitary volunteer forces known as Basijis, and gangs of thugs, known as the Ansar-e Hezbollah (Helpers of the Party of God), who often are aligned

with specific members of the leadership, act as vigilantes, and are released into the streets to intimidate and threaten physically demonstrators, journalists, and individuals suspected of counter-revolutionary activities. Both regular and paramilitary security forces committed numerous, serious human rights abuses.

. . .

The Government restricts citizens' right to change their government. Systematic abuses include extrajudicial killings and summary executions; disappearances; widespread use of torture and other degrading treatment, reportedly including rape; harsh prison conditions; arbitrary arrest and detention, and prolonged and incommunicado detention. Perpetrators often commit such abuses with impunity.

. . .

Violence against women occurs, and women face legal and societal discrimination. . . . Vigilante groups, with strong ties to certain members of the Government, enforce their interpretation of appropriate social behavior through intimidation and violence.

. . .

The State enforces gender segregation in most public spaces, and prohibits women mixing openly with unmarried men or men not related to them. Women must ride in a reserved section on public buses and enter public building, universities, and airports through separate entrances. . . . Women are subject to harassment by the authorities if their dress or behavior is considered inappropriate, and may be

sentenced to flogging or imprisonment for such vio-
lations.

The 1999 Report also described the Iranian government's
backlash to "reform," noting that the "Government closed
numerous reform-oriented publications during the year and
brought charges against prominent political figures and mem-
bers of the clergy for expressing ideas viewed as contrary to
the ruling orthodoxy." The record at Najmabadi's asylum
hearing also included the 1997 United States Department of
State's "Profile of Asylum Claims and Country Conditions"
issued on Iran (the 1997 Profile). The 1997 Profile stated that,

> the Islamic regime's human rights record continues
> to be abysmal, with continued reports of extrajudi-
> cial killings and summary executions; widespread
> use of torture and other degrading treatment; disap-
> pearances; arbitrary arrest and detention; lack of fair
> trials; harsh prison conditions; and repression of the
> freedoms of speech, press, assembly, association and
> religion. . . . Women are victims of domestic vio-
> lence as well as legal and social discrimination . . . .

With respect to women in particular, the 1997 Profile noted
that "[s]ome women who do not conform to [Iran's] dress
code have been subject to arrest and flogging. . . . Depending
on the individual woman's experiences and her personal cir-
cumstances, life in today's Iran can be unbearable under such
conditions."

[4] Najmabadi argues that the evidence she submits along
with her motion to reopen is "qualitatively different" from
that submitted at her initial asylum hearing. Specifically, Naj-
mabadi points to the 2003 Country Reports on Human Rights
Practices (the 2003 Report). However, the 2003 Report
merely describes conditions similar to those found in the 1999
Report. Though the 2003 Report states, "[t]he Government's
poor human rights record worsened," it goes on to describe,

in almost carbon copy form, the examples contained in the 1999 Report, i.e., "summary executions," "disappearances," "torture and other degrading treatment," and "flogging." This is significantly different from the situation in *Malty*, where we juxtaposed harassing telephone calls with torture, beatings, and death threats. The bulk of Najmabadi's remaining evidence, though voluminous, is similarly redundant.

**[5]** Moreover, as the BIA concluded, the evidence Najmabadi presents in her motion to reopen does not share the same type of individualized relevancy we required in *Malty*. There, in addition to presenting evidence of a change in country conditions indicating that harassment of Coptic Christians had escalated to persecution, Malty presented evidence detailing six separate incidents of persecution of his family members, including the threat that Malty would be arrested and prosecuted if he returned to Egypt. *Malty*, 381 F.3d at 944.

Likewise, in *Bhasin v. Gonzales*, we also required previously unavailable evidence to be material to the petitioner's claim. There, while the IJ had found the petitioner to have established a well-founded fear of future persecution, it denied asylum eligibility because the persecution was not "on account of" the petitioner's imputed political opinion or membership in a particular social group, that group being her family. *Bhasin*, 423 F.3d at 982. The BIA affirmed, finding that "other close members of the [petitioner's] family are living in India without difficulty. The [Islamic militant group] has not persecuted the respondent's brother, two daughters, or one daughter-in-law, the wife or her missing eldest son." *Id.* In granting the petition for review, we held that "later-discovered evidence presented in the motion to reopen rebuts this critical finding." *Id.* We explained that the petitioner presented new, previously unavailable evidence that her two daughters and son-in-law had received death threats, violent verbal threats, and had subsequently disappeared while the appeal before the Board was pending. *Id.* at 983.

**[6]** The evidence Najmabadi points to lacks the materiality we required in *Malty* and *Bhasin*. Rather, it simply recounts generalized conditions in Iran that fail to demonstrate "that her predicament is appreciably different from the dangers faced by her fellow citizens." *Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) (alterations and internal quotation marks omitted).

**[7]** Najmabadi points to the affidavit accompanying her motion to reopen as evidence of her change in particular circumstances. There, she asserts that she "will be active in trying to change Iran and the situation for women[,]" and that she "want[s] to make sure Iranian women get to wear [the clothes she designs] one day." The Board is required to accept as true the facts stated in Najmabadi's affidavit unless they are inherently unbelievable. *Limsico v. INS*, 951 F.2d 210, 213 (9th Cir. 1991). However, there is no indication that the Board failed to credit Najmabadi's affidavit, as it characterized her motion as premised on her "direct and imputed political opinion, and the fact that she is a 'westernized woman' " and specifically referenced both Iran's "limitations on the freedoms of women" and its punishment of dissenters. *See also Maroufi v. INS*, 772 F.2d 597, 600 (9th Cir. 1985) (finding no indication in the record that the BIA did not accept the truth of an affidavit's factual allegations accompanying a motion to reopen). Rather, the Board concluded that Najmabadi's evidence details conditions affecting the population at large. There is substantial evidence in the record to support such a finding.

Moreover, "[t]he [BIA] does not have to write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Lopez v. Ashcroft*, 366 F.3d 799, 807 n.6 (9th Cir. 2004) (alterations in original) (internal quotation marks omitted); *accord Wang v. BIA*, 437 F.3d 270, 275 (2d Cir. 2006) ("[W]e do not hold, and in fact

reject any implication . . . that where the BIA has given reasoned consideration to the petition, and made adequate findings, it must expressly parse or refute on the record each individual argument or piece of evidence offered by the petitioner." (internal quotation marks omitted)). Here, the Board adequately considered Najmabadi's evidence and sufficiently announced its decision. It noted that "limitations on the freedoms of women have been an unfortunate cornerstone in post-revolution Iran[,]" and expressed its belief that Najmabadi provided nothing besides speculative evidence to suggest that "returnees from the United States will likely face persecution." Though the Board did not directly reference Najmabadi's statements concerning her intent to be politically active in Iran, there is nothing to suggest it did not consider that evidence in deciding that post-revolution Iran has limited such activism for some time. We cannot say that the Board's failure to give reasons detailing why the affidavit did not present previously unavailable, material evidence was arbitrary, irrational, or contrary to law. *Cf. Maroufi*, 772 F.2d at 600 (finding that it was error for the BIA to assume an affidavit must be independently corroborated, but holding that such error was neither dispositive nor prejudicial).

**[8]** We have no doubt that the BIA would reach the same decision if we asked it to focus more closely on the contents of Najmabadi's affidavit. *Accord Wang*, 437 F.3d at 275 (declining to remand for Board to consider evidence on a motion to reopen where the Board failed to discuss the evidence "in any particular detail" because to do so would be futile). We are so confident for two reasons. First, we fail to understand how asserting that Najmabadi will be "active in trying to change Iran and the situation for women," or that Najmabadi wants to make Iranian women one day wear the clothes that she has designed, is evidence that "was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii). Second, though related, we have recognized the perverse incentive that would result from granting an applicant reopening based on a "self-

induced" change in personal circumstance; here, Najmabadi's desire to become politically active, following her previous testimony to the contrary. *See He v. Gonzales*, 501 F.3d 1128, 1132 (9th Cir. 2007); *Larngar v. Holder*, 562 F.3d 71, 76-77 (1st Cir. 2009) (collecting cases holding that a change in personal circumstances should not qualify as a change in country circumstances). That is because a motion pursuant to 8 C.F.R. § 1003.2(c)(3)(ii) must be "based on changed circumstances *arising in the country of nationality or in the country to which deportation has been ordered*." (emphasis added). Accordingly, substantial evidence supports the Board's finding that the evidence Najmabadi submitted in her motion to reopen was not qualitatively different from the evidence presented at the original hearing.

### 2.   Returnees From The United States To Iran

**[9]** The Board also held that there was no evidence establishing that returnees from the United States will likely face persecution. We have previously rejected an asylum claim based on the hatred of Iranians for Americans, noting that "this type of claim cannot possibly justify asylum[,]" because it would mean that "*every* citizen of a country unfriendly to the United States would be entitled to asylum." *Kaveh-Haghigy v. INS*, 783 F.2d 1321, 1323 (9th Cir. 1986) (per curiam).

### 3.   Disfavored Group

Finally, Najmabadi also argues that she has a well-founded fear of future persecution based on her membership in a disfavored group. According to Najmabadi, that group consists of "westernized" women forcibly removed from the United States to Iran. Establishing a well-founded fear of future persecution is one aspect of a petitioner's prima facie case for relief. *See Bhasin*, 423 F.3d at 984. Because the Board denied Najmabadi's motion to reopen based on her failure to introduce previously unavailable, material evidence, it did not

need to reach the question of whether Najmabadi established a prima facie case for relief.[2] *See Doherty*, 502 U.S. at 323. Thus, since our review is limited to the grounds actually relied upon by the BIA, *Ramirez-Altamirano*, 563 F.3d at 804, we decline to address Najmabadi's "westernized" group claim.[3]

**[10]** However, we note that Najmabadi's failure to provide evidence linked to her particular circumstances is similarly applicable in this context. *See Wakkary v. Holder*, 558 F.3d 1049, 1066 (9th Cir. 2009) ("[A] 'general, undifferentiated claim' based solely on the threat to the group as a whole is not sufficient for an individual petitioner to establish the requisite likelihood of persecution under the 'singled out individually'

---

[2]Similarly, in her motion to reopen, Najmabadi also sought asylum under the humanitarian exception. 8 C.F.R. §§ 1208.13(b)(1)(iii)(A), (B). However, because Najmabadi did not present previously unavailable, material evidence, the Board was entitled to deny the motion solely on those grounds. *See INS v. Abudu*, 485 U.S. 94, 104-05 (1988) (explaining that there are "at least three *independent grounds* on which the BIA may deny a motion to reopen," the second of which is the failure to introduce "previously unavailable, material evidence" (emphasis added)); *Toufighi*, 538 F.3d at 996. The Board was not required to give an additional basis for denying the motion. Indeed, Najmabadi's failure to provide previously unavailable, material evidence means that her motion is untimely. 8 C.F.R. §§ 1003.2(c)(1)-(3). In addition, we note that 8 C.F.R. §§ 1208.13(b)(1)(A), (B) provides for discretionary grants of asylum to victims of *past persecution*, from which Najmabadi has never claimed to suffer. *See Belishta v. Ashcroft*, 378 F.3d 1078, 1080 (9th Cir. 2004) (noting that the humanitarian asylum exception "provides for discretionary grants of asylum to victims of past persecution who no longer reasonably fear future persecution on account of a protected ground"); *Mohammed v. Gonzales*, 400 F.3d 785, 801 (9th Cir. 2005) (same).

[3]Ignoring this requirement, the dissent argues that Najmabadi has now demonstrated a prima facie case for relief "based on her Western appearance and affiliation." Dissent at 3701. While "[w]e have never recognized pro-Western as a social group protected against persecution," *Toufighi*, 538 F.3d at 997, we are nevertheless not permitted to address the issue in this case, since our review is limited to those grounds relied upon by the BIA, and the BIA was entitled to deny Najmabadi's motion to reopen based solely on her inability to produce previously unavailable, material evidence. *See Doherty*, 502 U.S. at 323.

rubric." (quoting *Lolong v. Gonzales*, 484 F.3d 1173, 1179 (9th Cir. 2007) (en banc)). That is, even assuming that Najmabadi is a member of a disfavored group, she points to no evidence of an *individualized* threat to persecute *her. See, e.g.*, *Melkonian v. Ashcroft*, 320 F.3d 1061, 1069 (9th Cir. 2003) (individualized threat found where petitioner's home had been broken into, his property destroyed, a woman was murdered caring for petitioner's cattle, and a man was murdered because they mistook him for the petitioner's father-in-law); *Sael v. Ashcroft*, 386 F.3d 922, 927-28 (9th Cir. 2004) (same where petitioner testified about past threats to her safety including that her car was vandalized, the boarding house she was living in was stoned, and an angry mob rushed a taxi in which she was riding and attempted to open the door); *Hartooni v. INS*, 21 F.3d 336, 341-42 (9th Cir. 1994) ("personal connection to the general persecution" found where soldiers stoned the petitioner's church while she was inside, approached the petitioner and a group of girls who did not have their hair properly bound, and visited the petitioner's home to inquire about relatives who fled to the United States); *Kotasz v. INS*, 31 F.3d 847, 854-55 (9th Cir. 1994) (denying asylum to petitioner who did not "specify any personal experiences pertaining to individual targeting for persecution" but granting as to petitioner who had been arrested at political demonstrations and was an active opponent of the Communist regime).

## CONCLUSION

**[11]** For the reasons described, we hold that the Board did not abuse its discretion in denying Najmabadi's motion to reopen.

**PETITION FOR REVIEW DENIED.**

PREGERSON, Circuit Judge, dissenting:

Farangis Najmabadi is a sixty-year-old native and citizen of Iran. She has lived in the United States since April 5, 1987. In those twenty-three years, she studied fashion design, established a dress-making business, and now designs Western style clothing for Iranian women.

In March 1998, the former INS initiated removal proceedings against Najmabadi for overstaying her tourist visa. Najmabadi appeared before an IJ without counsel. She applied for asylum, withholding, and relief under the Convention Against Torture. On April 11, 2000, the IJ denied Najmabadi's asylum claim. The IJ found Najmabadi credible, but concluded that she lacked a well-founded fear of future persecution based on the record at that time.

On July 20, 2001, Najmabadi appealed the IJ's denial to the BIA, this time with the assistance of counsel. On February 25, 2003, the BIA affirmed the IJ's decision without opinion. On August 18, 2004, this Court denied Najmabadi's petition for review. *Najmabadi v. Ashcroft*, 107 F. App'x 98 (9th Cir. 2004).

On December 14, 2004, Najmabadi filed a motion to reopen with the BIA based on the changed circumstances in Iran following September 11, 2001. On March 31, 2005, the BIA denied Najmabadi's motion to reopen. The majority denies Najmabadi's petition for review of the BIA's denial of her motion to reopen. I would grant that petition.

Some of the evidence Najmabadi submitted shows a reasonable likelihood[1] that Najmabadi has satisfied the require-

---

[1]This court has held that a motion to reopen must be supported with new evidence, but "need only establish a prima facie case for relief, and need not conclusively establish that [the petitioner] warrants relief." *Ordonez v. INS*, 345 F.3d 777, 785 (9th Cir. 2003). A "respondent demonstrates prima facie eligibility for relief where the evidence reveals a *reasonable likelihood* that the statutory requirements for relief have been satisfied." *Id.* (citing *In re S-V-*, 22 I. & N. Dec. 1306 (BIA 2000)) (emphasis added).

ment of a one in ten chance of persecution[2] based on her Western appearance and affiliation. For example, the record reflects that in 2003, two long-term Iranian U.K. residents were forcibly returned to Iran. Amnesty International reported that the two Iranians may have faced torture and been held in detention. Additionally, the record contains a May 2004 U.S. State Department travel warning which states that U.S. citizens may be at risk of "harassment or kidnapping" in Iran. Further, the warning said "U.S. citizens of Iranian origin who are considered by Iran to be Iranian citizens have been detained and harassed by Iranian authorities."

Although Najmabadi is not a U.S. citizen, she has lived in the U.S. for the last twenty three years and has the appearance and mannerisms of an Iranian-U.S. citizen. Najmabadi herself said that she "looks and acts like a Westerner derived from twenty years of living in the United States." Najmabadi's affidavit asserts that the Iranian government punishes Iranians sent back sent back to Iran from the U.S. with "torture, flogging, executions, beheadings and lashes." As the majority notes, under *Limisco v. INS*, 951 F.2d 210, 213 (9th Cir. 1991), the BIA is required to accept these facts, stated in Najmabadi's motion to reopen, as true unless they are inherently unbelievable. Najmabadi's assertions that the Iranian government mistreats Iranians sent back from the U.S. are not inherently unbelievable. Iran's human rights violations are widely known and supported by the record. Therefore, Najmabadi's assertions should be accepted as true.[3]

---

[2]It is well-established that asylum may be granted where an applicant demonstrates a one in ten chance of persecution. *See Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001). Thus, Najmabadi's motion to reopen need only establish that there is a reasonable likelihood that she faces at least a one in ten chance of persecution.

[3]It is also worth noting that in his original decision denying Najmabadi's claims for relief, the IJ found "no reason to doubt [Najmabadi's] truthfulness and veracity."

The State Department Human Rights Country Reports for Iran from 1999 to 2004 uniformly state that "citizens returning from abroad sometimes were subjected to searches and extensive questioning by government authorities for evidence of anti-government activities abroad." The reports also uniformly state that "authorities sometimes harassed women if their dress or behavior was considered inappropriate and women may be sentenced to flogging or imprisonment for such violations."

Although the Country Reports remained consistent from 1999 to 2004, before and after Najmabadi's immigration court merits hearing, it is difficult to understand how anyone could think that conditions in Iran for those associated with the West have not dramatically changed for the worse following September 11, 2001. Indeed, the case cited by both parties and the majority opinion on the standard for a motion to reopen based on changed country conditions, *Malty v. Ashcroft*, recognized that a "petitioner's evidence regarding changed circumstances will almost always be related to his [or her] initial claim; nothing in the statute or regulations requires otherwise." 381 F.3d 942, 945 (9th Cir. 2004).

The BIA's conclusion that there is no evidence supporting the likelihood of persecution of returnees from the U.S. "outside the realm of speculation" is undermined by the above described record evidence. Najmabadi submitted some new evidence, which was unavailable at the time of Najmabadi's hearing before the IJ, including the Amnesty International Report and the 2004 U.S. State Department travel warning. It is reasonably likely that, upon reopening, Najmabadi could establish that she faces a one in ten risk of being targeted and detained by the Iranian government or non-government agents that the government is unable or unwilling to control.

In conclusion, Najmabadi has lived in this country for twenty-three years as an entrepreneur, a small business owner, and a law-abiding member of her community. Because I

believe that Najmabadi should be granted the chance to reopen her case to provide evidence regarding the persecution of individuals returned from the West to Iran, including "torture, flogging, executions, beheadings, and lashes," I respectfully dissent.