**Mehran NAJAFI, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 96–2593.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1996.

Decided Jan. 15, 1997.

Paul D. Gresk (argued), Johnson, Smith, Densborn, Wright & Heath, Indianapolis, IN, for petitioner.

Stephen W. Funk, Michelle Gluck (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, Lynn K. Holland, Chicago, IL, for respondent.

Before BAUER, COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Mehran Najafi petitions this court pursuant to 8 U.S.C. § 1105a(a) to review the final decision of the Board of Immigration Appeals denying Najafi's request for asylum, withholding of deportation, and suspension of deportation. Because we conclude that the inquiry into Najafi's fear of religious persecution was mis-framed, we set aside the

Board's determination and return this matter to the Board for further consideration.

## I.

Mehran Najafi, a native of Iran, came to the United States on a student visa in October 1978. After returning to Iran for a brief visit in 1979 for medical treatment, he graduated from high school in Indianapolis in 1980, and earned a degree in electrical engineering from Purdue in 1985. At this point, his student visa lapsed, and he remained in the country on a professional, non-immigrant visa.[1] He completed some graduate work and has been employed as an engineer for the past six years. Najafi married an American citizen some time in the late 1980's. Sponsored by his wife, Najafi applied for permanent residency. The marriage failed. Following his divorce in 1990, he abandoned his application for residency and filed for political asylum, which we assume was denied.

An Order to Show Cause was issued against Najafi in May 1993. He filed for asylum and withholding of deportation.[2] In January 1994, the immigration judge ordered Najafi deported. He appealed to the Board, which dismissed his appeal. Najafi filed a motion to reopen for reconsideration in August 1995. On April 1, 1996, the Board affirmed its earlier decision to dismiss the appeal. Najafi now appeals to this court.

Najafi is 34, unmarried, and has no children. Of course, further details of his life, primarily concerning his religion and family background, are relevant to our determination regarding asylum or deportation. We are able to glean the following facts almost wholly from Najafi's testimony before the immigration judge.

Born a Moslem, Najafi was introduced to the Indianapolis Church of Christ in 1984, and has been a church participant, attending Bible study and services since his conversion in 1989. He has contributed some money to the church: for example, he has documented checks totaling $227 donated to the church between December 1990 and September 1991. Although a college roommate has sponsored Najafi for membership in the church, he has not participated in any formal induction.

Najafi's father was a member of the Shah's party and a high ranking bank official prior to the revolution. Najafi was a member of the Shah's youth party. After the revolution, his father and uncle were imprisoned for a short time and both lost their jobs. His father, now a sort of business consultant, is periodically interrogated by the government. Najafi's family continues to reside in Shiraz, Iran.

## II.

Najafi appeals the April 1, 1996 decision of the Board of Immigration Appeals that denied relief from deportation. By statute our review is limited to that decision. 8 U.S.C. § 1105a(a). However, because the Boards' reconsideration simply affirms the Board's April 3, 1994 decision, which adopts the reasoning of the immigration judge's January 19, 1994 decision, we review the original decision. *Dobrican v. INS,* 77 F.3d 164, 167 (7th Cir.1996). We review the decision of the immigration judge for an abuse of discretion, meaning we determine whether it was supported by "reasonable, substantial, and probative evidence." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *Urukov v. INS,* 55 F.3d 222, 227 (7th Cir.1995). To reverse, we must conclude that no "reasonable fact finder" would have found that the alien failed to satisfy the statutory requirements for relief from deportation. *See Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. at 815.

Here we consider three statutory tests: those for asylum, 8 U.S.C. § 1158(a), withholding of deportation, 8 U.S.C. § 1253(h), and suspension of deportation, 8 U.S.C. § 1254. We recognize that Najafi bore the

---

1. We note that these changes in visa status and personal circumstance are not well documented in the record. We base this account in part on representations of counsel made at oral argument.

2. We assume this petition was distinct from his original request for asylum.

burden of proof in each of these statutory hurdles. *INS v. Stevic,* 467 U.S. 407, 424, 104 S.Ct. 2489, 2497–98, 81 L.Ed.2d 321 (1984) (withholding of deportation); *Balazoski v. INS,* 932 F.2d 638, 640 (7th Cir.1991) (withholding of deportation and asylum); *Kuciemba v. INS,* 92 F.3d 496, 499 (7th Cir.1996) (suspension of deportation).

We begin by distinguishing these three statutory avenues for relief from deportation. Najafi petitions for asylum in the United States pursuant to 8 U.S.C. § 1158(a). To succeed, he must qualify as a "refugee" under 8 U.S.C. § 1101(a)(42)(A), defined as a person who is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See Krastev v. INS,* 101 F.3d 1213, 1216 (7th Cir.1996); *Mitev v. INS,* 67 F.3d 1325, 1329 (7th Cir.1995). "To show 'a well-founded fear' a petitioner must demonstrate that the fear is (subjectively) genuine and that it is reasonable in light of the (objective) credible evidence." *Dobrican v. INS,* 77 F.3d 164, 167 (7th Cir. 1996). Once refugee status is established, the Attorney General may grant the alien asylum. *Krastev,* 101 F.3d at 1216. The immigration judge must give reasons for this discretionary determination. *See Bastanipour v. INS,* 980 F.2d 1129, 1131 (7th Cir. 1992). In the instant case, the immigration judge was unconvinced of Najafi's "well-founded fear of persecution" and therefore Najafi did not achieve refugee status. Thus, here, it is only necessary for us to review the first portion of the asylum inquiry.

Second, Najafi applied for withholding of deportation pursuant to 8 U.S.C. § 1253(h). The statute reads in pertinent part: "the Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such a country on account of race, religion, nationality, membership in a particular social group, or political opinion." To succeed under this section of the Immigration and Nationality Act, a petitioner must demonstrate a "clear probability of persecution." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 430, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987). "Clear probability" has been interpreted to mean that it is more likely than not that the deportee would be subject to persecution. *Stevic,* 467 U.S. at 429–30, 104 S.Ct. at 2501. Addressing Najafi's withholding of deportation claim, the immigration judge simply extended his analysis under the asylum provisions: if Najafi had not established a "well-founded fear of persecution," certainly no "clear probability of persecution" existed.

Third, Najafi requests a suspension of deportation pursuant to 8 U.S.C. § 1254. For the Attorney General to suspend deportation, the immigration judge must find that the alien (1) has been physically present in the United States for a continuous period of seven years immediately preceding the date of the application for suspension, (2) proves that during all of such period he was and is a person of good moral character, and (3) is a person whose deportation would, in the opinion of the Attorney General, result in "extreme hardship" to the alien or to his spouse, parent, or child, who is a citizen. 8 U.S.C. § 1254. Like the asylum provision, once these statutory criteria are satisfied, the grant of suspension is within the Attorney General's discretion. Here, the immigration judge found that Najafi satisfied the first two requirements, presence and character, and that, given the equities of the situation, the Attorney General would, if she could, grant suspension. However, Najafi failed to establish "extreme hardship." Because suspension is an "exceptional remedy," *INS v. Wang,* 450 U.S. 139, 145, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981) (per curiam); *Kuciemba,* 92 F.3d at 499, " '[e]xtreme hardship' will not be found without a showing of significant actual or potential injury, in the sense that the petitioner will suffer hardship 'substantially different from and more severe than that suffered by the ordinary alien who is deported.' " *Kuciemba,* 92 F.3d at 499 (quoting *Palmer v. INS,* 4 F.3d 482, 487–88 (7th Cir.1993)). Compelled to interpret "extreme hardship" narrowly, the immigration judge did not accept Najafi's forecasted economic difficulties caused by displacement as "extreme hardship." The immigration judge

again relied on his asylum analysis to dismiss any fears of future persecution.

In the eyes of the immigration judge, Najafi did not bear his burden of proof with respect to any of these statutory tests: he demonstrated neither a "well-founded fear of persecution," nor a "probability of persecution," nor "extreme hardship." With the exception of the economic component of Najafi's claim for suspension of deportation, the factual underpinnings of each claim are identical. Recognizing that the tests are of differing levels of vigor, *see INS v. Cardoza–Fonseca*, 480 U.S. 421, 429, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987), we begin our analysis with Najafi's asylum claim, as, of the three tests, "the well-founded fear of persecution" showing is most easily satisfied. *See Dobrican*, 77 F.3d at 168.

### III.

Arguing that no reasonable fact-finder could have failed to find that he had a well-founded fear of persecution, Najafi urges this court to reverse the Board of Immigration Appeals. He identifies three potential reasons why he might be persecuted: his family's politics, his social group, and his religion. We discuss each in turn.

### A.

■ Najafi submits that his family's political past and current treatment by the Iranian government increase the likelihood that he will be subject to some form of political persecution. Najafi argues that the immigration judge did not give sufficient weight to his testimony detailing his father's and uncle's post-revolution imprisonment and his father's present, periodic interrogation. We disagree. Najafi failed to establish the relevancy of this testimony. His account of the persecution of his two relatives does not prove, or even tend to prove, that Najafi himself will be the subject of persecution. Najafi established no nexus between his relatives' politics, which resulted in harsh treatment by the Iranian authorities, and his own politics. Nor did he show that he might be the subject of any mistreatment because of his blood tie to political dissidents. *See Arriaga–Barrientos v. INS*, 937 F.2d 411, 414 (9th Cir.1991) (to show "well-founded fear of persecution" through past persecution of relatives, alien must show self to be "similarly situated" or pattern of persecution "closely tied" to self). What is lacking from Najafi's testimony is a link to himself. Najafi testified that he was never politically active in Iran, nor has he publicly expressed a political view regarding the current regime in Iran while living in the United States. The immigration judge was given no reason to connect Najafi's apolitical existence to his family's experience.

### B.

■ Najafi further argues that the immigration judge failed to appreciate that he is a member of a social group that could be singled out for persecution. Najafi considers himself part of a discrete class of Iranians who left the country before the revolution, were educated in the United States, and refused to return to fight in the revolutionary army. Again, Najafi's testimony does not prove enough. Najafi neither defines for us a cognizable group nor establishes that this group is persecuted upon return to Iran. Apart form a western education and the concomitant exposure to a more liberal political system, Najafi does not explain what traits, ideas, or activities bind his social group together. Further, Najafi does not establish that members of this nebulous group are accorded any different treatment by the government upon return to Iran.

■ As for the draft-avoidance component of his argument, it does not aid his case for "a well-founded fear of persecution": the Supreme Court has held that punishment for failure to serve in the military is not persecution. *Elias–Zacarias*, 502 U.S. at 482–83, 112 S.Ct. at 816. In *Dobrican v. INS*, we allowed that conscientious objection based on religious belief might be some form of protected activity and thus qualify for an exception to this blanket rule. 77 F.3d at 168. Najafi submits that he failed to respond to the draft because of his religious belief. This assertion appears disingenuous: Iran's call to revolution was in 1979; Najafi was exposed to his current faith in 1984 and converted

some time later. Najafi identified for the immigration judge no other earlier held faith that would prohibit military service in Iran.

### C.

■ While Najafi's first two grounds for a "well-founded fear of persecution" are readily dismissed, his third warrants a much closer examination. Najafi argues that the immigration judge erred in his analysis of Najafi's fear of religious persecution. Apostasy, that is abandoning Islam for another religion, is a capital crime in Iran. Najafi has converted to Christianity, and thus, he argues, is at risk of the death penalty upon his return. The immigration judge, while recognizing that Iran is "extremely harsh" on converts, did not find evidence of Najafi's conversion conclusive.[3] In light of this Circuit's precedent addressing apostasy as a basis for asylum, *Bastanipour v. INS*, 980 F.2d 1129 (7th Cir. 1992), we believe that the immigration judge mis-framed his inquiry.[4]

Perhaps taking his cue from the State Department recommendation, the immigration judge treated the question of whether Najafi is a Christian as dispositive of his claim of religious persecution. That is not the exact inquiry required by Bastanipour, in which we vacated a decision of the immigration judge that rejected a claim of apostasy because the petitioner had not formally converted to Christianity. Rather, we must ask whether the alien is an apostate: that is, whether he has turned away from Islam. *Bastanipour*, 980 F.2d at 1132. The immigration judge is certainly correct that Najafi's Christianity would be evidence of apostasy. However, by this semantic distinction between convert and apostate, we mean to shift the focus of the immigration judge from Indianapolis to Iran, for it is on Najafi's future treatment in Iran that our inquiry must center. By itself, the fact that Najafi is

an apostate is not outcome determinative in our asylum proceedings. To assess a well-founded fear of persecution, we need to know how the ordinary apostate, as opposed to a Christian clergyman or a known criminal, see *Bastanipour*, 980 F.2d at 1133, is treated in Iran. With this information, we will be able to approximate Najafi's situation if returned to Iran. The burden of proof, of course, in this inquiry remains on Najafi.

To establish that he was in danger of religious persecution as an apostate, Najafi relies on the religious law that apostasy is a capital crime and a few news articles describing isolated incidents of punishment for apostasy throughout the Islamic world—not overwhelming evidence that he personally, as an ordinary apostate, would be in peril if returned to Iran.[5] In his determination, the immigration judge curtailed this inquiry by accepting the State Department's opinion that Iran is "extremely harsh" on converts. Thus, extending the judge's reasoning, if Najafi can prove that he is an convert, it would follow that he has a well-founded fear of persecution. The immigration judge limited the potential of this logic by requiring that Najafi establish that the Iranian government could have become aware of his beliefs.

While covering relevant ground, we conclude that the immigration judge's emphasis is misplaced in three points. First, the opinion gives conditions in Iran short shrift. How apostates are treated in Iran is at the heart of the asylum inquiry. The immigration judge devotes a sentence. See *Osaghae v. INS*, 942 F.2d 1160, 1164 (7th Cir.1991) (remanding where "nothing in the Board's opinion suggests that the Board is knowledgeable about Nigeria"). Presumably the denial of asylum is supported by probative, substantial evidence. Such a standard demands a more informed assessment of conditions in Iran.

---

**3.** We note that the immigration judge did not rest his decision on Najafi's credibility, *see Bastanipour*, 980 F.2d at 1132 (insincerity possible ground for denial of asylum), but rather required a "more developed objective foundation" of conversion.

**4.** The immigration judge addresses *Bastanipour* by concluding that the record is "far less devel-

oped in establishing his conversion" than the record in *Bastanipour*.

**5.** We recognize that the death penalty on the books alone carries weight in establishing a fear of persecution. We do not mean to minimize its significance. However, an alien's claim would be strengthened by evidence that proved apostates are actively prosecuted.

Second, the bulk of the immigration judge's opinion concerns Najafi's conversion. Determination of a religious faith by a tribunal is fraught with complexity as true belief is not readily justiciable. *See United States v. Ballard,* 322 U.S. 78, 93–94, 64 S.Ct. 882, 889–90, 88 L.Ed. 1148 (1944) (Jackson, J., dissenting). In an asylum case involving a country which punishes the abandonment of religious belief, our task is theoretically easier. We must ask ourselves what would count as conversion in the eyes of the Iranian Religious Judge. *Bastanipour,* 980 F.2d at 1132. Accordingly, we are not as concerned with the heart of the convert, but rather require some bonafide indicia of apostasy which would matter to the Iranian authorities.

Certainly, true conversion does matter in one sense. If one is a believer in a religious faith, one would presumably wish to practice that faith. Religious adherence could take the form of attending services, meeting with others of the same faith, personal prayer, or openly sharing one's belief, to name a few examples. If any activity necessary to a convert could trigger persecution in Iran, such a practice should be brought to the attention of the immigration judge. To evaluate the relevance of this practice to the life of the alien, the immigration judge should be satisfied with the sincerity of the alien's new religious commitment.

Najafi testified that he was introduced to Indianapolis Church of Christ in 1984 and converted to Christianity in 1989. He testified that since that time he has been a regular participant in church services and Bible Study. Where asylum turns on apostasy, word of conversion is not enough. We need evidence that corroborates this turn from Islam, evidence that is either (1) damning in the eyes of the Iranian Religious Judge in and of itself, or (2) evidence that the alien's conversion currently entails religious practices prohibited and prosecuted in Iran. Najafi produced a letter from the church treasurer which stated that Najafi visits worship service periodically. He also submitted bank records from December 1990 to September 1991 detailing small contributions totaling $227. The immigration judge found that this evidence was inconclusive with regard to Najafi's Christianity. Apart from the degree of commitment to his new faith, what we must inquire of is whether this evidence might result in a prosecution for apostasy.

■ Finally, the immigration judge required that Najafi prove that the Iranian authorities would know about his religious activities. While evidence that authorities lie in wait to punish an asylum applicant would certainly strengthen any petition to the Board, it is not evidence necessary to the "well-founded fear" inquiry. *See Osaghae v. INS,* 942 F.2d 1160, 1164 (7th Cir.1991) ("Asylum is not limited to the notorious"). In *Bastanipour,* noting that the INS makes no effort to conceal asylum or deportation proceeding from Iran and that an apostate would have to refuse to practice his Christianity to escape notice in Iran, we make light of the Board's suggestion that the Iranian authorities would fail to recognize the apostate in their midst. 980 F.2d at 1133. Accordingly, we do not require evidence that the Iranian government has taken prior notice of Najafi. However, as articulated above, evidence that Najafi's current Christian practices would most likely draw censure as offensive to the Iranian government would strengthen his petition.

Because the immigration judge's analysis is inconsistent with our case law, we remand Najafi's claim for asylum based on a fear of religious persecution to the Immigration Board. On remand, so that an informed decision can be made, it would behoove Najafi to establish with some concreteness what constitutes apostasy to the Iranian government today. And the immigration judge might be well-advised to solicit the current perspective of the State Department. While focus might additionally turn to the religious nature, if any, of Najafi's marriage or an indication from Najafi's minister as to his turn from Islam, we are not suggesting that these details would have critical significance as to how Najafi would be treated upon return to Iran. Perhaps a more pertinent inquiry would be what sort of religious freedom Najafi now enjoys in the United States that would be curtailed or punished if practiced in Iran.

As discussed earlier, the standards to suspend or withhold deportation are stricter than the standard to qualify for asylum. As we are presently unable to determine the extent of Najafi's fear of religious persecution, and whether an objective basis exists for it, we decline to reach his remaining claims. These will be ready for adjudication once the evidence is properly framed.

For the reasons stated above, we REMAND this petition to the Board of Immigration Appeals for further proceedings consistent with this opinion.