**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PEJMAN TOUFIGHI,

     *Petitioner,*

   v.

MICHAEL B. MUKASEY,* Attorney
General,

     *Respondent.*

No. 04-74010

Agency No.
A76-382-466

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

On Petition for Review of an Order of
the Board of Immigration Appeals

Argued and Submitted
August 9, 2007—Pasadena, California

Filed December 13, 2007
Amended August 18, 2008

Before: Marsha S. Berzon and Sandra S. Ikuta,
Circuit Judges, and James K. Singleton, Jr.,**
Senior District Judge.

Opinion by Judge Singleton;
Dissent by Judge Berzon

---

 *Michael B. Mukasey is substituted for his predecessor, Alberto R. Gonzales, as Attorney General of the United States, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

 **The Honorable James K. Singleton, Jr., Senior United States District Judge for the District of Alaska, sitting by designation.

10879

**COUNSEL**

Theodore Whitley Chandler, Sidley Austin, San Francisco, California, for the petitioner.

Adam M. Dinnell (argued) and Terri Scadron, United States Department of Justice, Civil Division, Washington, D.C., for the respondent.

**ORDER**

The opinion filed December 13, 2007, slip op. 16371, is amended as follows.

1. At slip op. 16387, footnote 14, replace the sentences that begin <While the Department of Homeland . . .> and end

<we lack jurisdiction to review the IJ's decision.> with <In light of the IJ's factual determinations that Toufighi was not a genuine convert to Christianity, was not an apostate, and would not be considered an apostate by the Iranian authorities, and given our lack of jurisdiction to review these factual determinations, we do not reach the separate question whether a petitioner could establish a well-founded fear of persecution based on evidence of apostasy, or evidence that the petitioner would be perceived as an apostate by Iranian officials, in a case where the petitioner failed to prove that the petitioner's conversion was genuine. *Cf. Najafi v. INS*, 104 F.3d 943, 949 (7th Cir. 1997) (noting that evidence regarding the "sincerity of the alien's new religious commitment" can be relevant to an asylum claim based on apostasy, but is not dispositive).>.

---

## OPINION

SINGLETON, Senior District Judge:

Pejman Toufighi, a native and citizen of Iran, petitions for review of a decision of the Board of Immigration Appeals ("Board") which denied his motion to reopen his claims for asylum and withholding of removal. Toufighi sought to reopen the proceedings in reliance on his marriage to a United States citizen, and what he contended were changed circumstances in Iran material to his claims. We have jurisdiction over the final order denying Toufighi's motion to reopen proceedings. 8 U.S.C. § 1252(a)(5). We deny the petition for review.

### BACKGROUND

Pejman Toufighi is a native and citizen of Iran. He was admitted to the United States on or about March 16, 1996, as a non-immigrant visitor with authorization to remain for six months. Toufighi remained in the United States beyond his

six-month stay without authorization from the Immigration Service ("Service"). In May of 1997, the Service instituted removal proceedings.

On August 8, 1997, Toufighi appeared with counsel and conceded that he was removable. The Immigration Judge ("IJ") granted additional time to consider available forms of relief, and in anticipation of an asylum claim, directed parties to file supporting documents by the hearing date of September 18, 1997. In September, Toufighi appeared with counsel and received a further continuance to allow him time to obtain additional documents.[1] The IJ set the hearing for April 1, 1998, and gave Toufighi until March 2, 1998, to submit additional supporting documents.

Toufighi appeared with counsel at the hearing on April 1, 1998, and testified on his own behalf. Essentially, Toufighi claimed that he had converted from Islam to Christianity, and that he feared that he would be persecuted upon return to Iran for committing apostasy. In support of his claim, Toufighi testified that he was introduced to Christianity while in college in Iran, but did not convert because he was afraid of the ramifications. He alleged that after arriving in the United States to visit his sister he began regularly attending church and prayer meetings and had become a Christian.

Toufighi also submitted in support of his claim several unauthenticated official documents translated from Farsi, and two letters from a Christian pastor attesting to his conversion. The IJ, finding that Toufighi had been given sufficient time to properly authenticate his documents, refused to consider the unauthenticated documents translated from Farsi. The letters from the pastor were admitted over the objection of the

---

[1]The documents presented in September 1997 included an Amnesty International Report on Iran, unauthenticated translations of documents written in Farsi, and a letter from the pastor of a Christian church serving, *inter alia*, Persian immigrants.

Service, but the IJ discounted them because they were not
from the pastor of Toufighi's alleged home church, and nei-
ther the pastor who wrote the letters, nor the pastor of Tou-
fighi's alleged home church, were present to testify to their
knowledge of Toufighi's religious beliefs.

The IJ found that Toufighi's testimony was generally credi-
ble, but that Toufighi had not in fact converted to Christianity:

> [T]he Court would note that he has very deep con-
> cern as to the genuineness as [to] the respondent's
> claimed conversion from Muslim to Christianity.
> The respondent testified that he attended church
> every Sunday since he came to the United States in
> 1996, at least December 1996. The respondent, how-
> ever, apparently knows very little about the "Bible"
> that he studied. The respondent cannot even name
> the 12 apostles of Jesus Christ. With the Court's
> understanding that Christianity begins with the life
> and teaching of Jesus Christ in the New Testament,
> the 12 apostles have some of the most important, if
> not the most important, writings of Christianity. The
> Court has serious doubt in the respondent's conver-
> sion to Christianity when he cannot even give the
> names of the 12 apostles of Jesus Christ. The respon-
> dent's knowledge about Christianity [was presented]
> to the Court in such general terms that any person of
> any religion can come up with that description of
> their religion, namely peace, tranquility, and love.
> The respondent is not able to give any specific
> knowledge that he has learned from attending Chris-
> tian church every Sunday, for four hours each day,
> for at least the last year-and-a-half, and also his
> desire to become a Christian was so big that he had
> to "escape" his home country and come to the
> United States to learn and become a Christian. The
> Court just would not believe that the respondent's
> claimed conversion is genuine in nature. The Court

would find that the respondent's alleged conversion from Muslim to Christianity is basically as a vehicle for him to apply for political asylum in the United States.

The IJ further found that Toufighi had not previously practiced Christianity in Iran, and implicitly found that he would not practice it there in the future because his alleged apostasy was simply a ruse to gain asylum. Based on these findings, the IJ concluded that Toufighi had not established past persecution, or a well-founded fear of persecution upon his return to Iran.

The IJ therefore denied Toufighi's claim for asylum, and because the standard was higher, also denied the request for withholding of removal.[2] The IJ then granted Toufighi's alternate request for voluntary departure, giving him until May 31, 1998, to depart.

Toufighi challenged the IJ's decision, filing a timely notice of appeal with the Board. However, he failed to timely file a brief in support of his appeal, and the Board accordingly dismissed it in May 2002, pursuant to 8 C.F.R. § 1003.1(d)(2)(i)(E) (formerly 8 C.F.R. § 3.1(d)(2)(i)(D) (2002)).[3] The Board's dismissal permitted Toufighi to volun-

---

[2]In order to obtain withholding of deportation on the basis of future persecution, an applicant must demonstrate a clear probability of persecution. *INS v. Stevic*, 467 U.S. 407, 413 (1984). In contrast, an applicant seeking asylum as a refugee, need only show a well-founded fear of persecution, a lesser standard. *See INS v. Cardoza-Fonseca,* 480 U.S. 421, 428 (1987).

[3]Although the Board prefaced the dismissal with a statement that it had reviewed the record and was not persuaded that the IJ's ultimate resolution was in error, we have held such dismissals to be procedural and not on the merits. *See, e.g., Garcia-Cortez v. Ashcroft*, 366 F.3d 749, 752 (9th Cir. 2004). We have also held that summary dismissal for failure to timely file a brief is improper if the notice of appeal is sufficiently specific to focus the Board's attention on the specific findings of fact and conclusions of law that the alien contends were erroneous. *Id.* at 753. Here, Toufighi included an "attachment sheet" with his notice of appeal setting out his claims of error. However, Toufighi did not seek timely review of the dismissal of his appeal, and we do not review it here.

tarily depart within thirty days, and warned him that if he failed to timely depart he would be removed, subjected to a fine, and made ineligible for a period of ten years for any further relief under certain sections of the Immigration and Nationality Act.[4]

Toufighi did not depart as promised. On October 16, 2003, he filed a motion to reopen his case to adjust his status to that of a lawful permanent resident based upon his recent marriage to a United States citizen. Alternatively, he asserted that changed conditions in Iran warranted reopening his asylum claim.[5]

The Board denied the motion on July 15, 2004. First, the Board found that as a consequence of Toufighi's failure to voluntarily depart pursuant to the Board's grant of voluntary departure dated May 21, 2002, Toufighi was barred from applying for adjustment of status for ten years in accordance with 8 U.S.C. § 1229c(d). Second, the Board concluded that the application for adjustment of status was barred as untimely pursuant to 8 C.F.R. § 1003.2(c)(2). Third, the Board rejected the motion to reopen based on changed circumstances in Iran because it was not supported by evidence that Toufighi would be directly affected by the alleged changes:

The respondent alternatively requests reopening of

---

[4]The Board's Order, dated May 21, 2002, established a new departure date thirty days thereafter and restarted the ten-year period of ineligibility. *Zazueta-Carrillo v. Ashcroft*, 322 F.3d 1166, 1173-74 (9th Cir. 2003).

[5]The changed conditions to which Toufighi referred did not address religion in general, or Christian-Muslim relations in particular, but sought to show that since the latest Iraq war, Iran had been persecuting proponents of liberal pro-Western or pro-American ideologies. Toufighi expressed fear that if he and his family returned to Iran they would be perceived as Americans or American sympathizers and persecuted on that basis. Toufighi did not seek to challenge with new evidence the IJ's finding that his conversion to Christianity was a ruse.

his asylum and withholding of removal claims based upon alleged changed conditions in Iran. To support his motion, the respondent has submitted some general news articles related to recent events in that country. None of the submitted information, however, contains *prima facie* evidence that the respondent would be directly affected by any changes noted therein. Moreover, the Immigration Judge previously rejected the respondent's assertion that he had converted to Christianity; the respondent's religious conversion was the basis of his claims. To the extent this information [the materials submitted by Toufighi] would relate to persecution of Christians in Iran, the respondent has already failed to establish that this would affect him. We are not in a position to readjudicate the merits of his original appeal at this point. Thus, none of the new evidence is material with respect to the respondent's claims.

In August 2004, Toufighi timely petitioned this Court for review of the final order of the Board dismissing his motion to reopen.

## STANDARDS GOVERNING REVIEW

Denials of motions to reopen are generally reviewed for abuse of discretion. *INS v. Doherty,* 502 U.S. 314, 323-24 (1992); *INS v. Abudu,* 485 U.S. 94, 104-05 (1988). This Court defers to the Board's exercise of discretion unless it acted arbitrarily, irrationally or contrary to law. *Caruncho v. INS*, 68 F.3d 356, 360 (9th Cir. 1995); *Lainez-Ortiz v. INS*, 96 F.3d 393, 395 (9th Cir. 1996). The Board's determination of purely legal questions is reviewed *de novo* except to the extent that deference is owed to its interpretation of the governing statutes and regulations. *Rodriguez-Lariz v. INS*, 282 F.3d 1218, 1222 (9th Cir. 2002); *Simeonov v. Ashcroft*, 371 F.3d 532, 535 (9th Cir. 2004). Factual findings are reviewed for sub-

stantial evidence. *Sharma v. INS*, 89 F.3d 545, 547 (9th Cir. 1996).

DISCUSSION

A. Motion to Reopen based upon Marriage and the Birth of Children

In reviewing Toufighi's claims we must bear in mind that motions to reopen, like motions for new trial based upon newly discovered evidence, are disfavored. *Doherty*, 502 U.S. at 323 (citing *Abudu*, 485 U.S. at 107-08). While the Board has broad discretion in ruling on a motion to reopen, it must show proper consideration of all factors, both favorable and unfavorable, in determining whether to grant a motion to reopen. *Bhasin v. Gonzales*, 423 F.3d 977, 983 (9th Cir. 2005).

In October 2003, Toufighi sought reopening to permit him to apply for adjustment of status on the ground that he had married a United States citizen and fathered children who are also citizens. The Board declined to hear this argument for two reasons. First, as a consequence of Toufighi failing to depart as ordered in 2002, he was statutorily ineligible to apply for adjustment of status for a ten-year period.[6] *See* 8 U.S.C. § 1229c(d)(1)(B). Second, his application, made

---

[6]Toufighi concedes that he was twice ordered to depart voluntarily and twice warned that the civil consequences of failing to depart included a ten-year bar on applying for an adjustment of status. He argues that, construing the statutes and regulations in his favor, his failure to post the bond required as a condition of voluntary departure relieved him of the civil penalties for failing to depart. In Toufighi's view, failure to post the required bond terminates the right to voluntary departure, leaving the alien under an order of removal, to which the civil penalties do not attach. An alien in this situation may remain in the country with impunity subject only to being removed if he is found. Toufighi relies upon *In re Diaz-Ruacho*, 24 I. & N. Dec. 47 (BIA 2006). Our disposition of this petition makes it unnecessary for us to determine whether *In re Diaz-Ruacho* is entitled to deference.

nearly seventeen months after the final order of removal, was untimely. *See* 8 C.F.R. § 1003.2(c)(2).

**[1]** Toufighi's motion to reopen to apply for adjustment of status was properly denied regardless of whether the ten-year bar on discretionary relief for failing to voluntarily depart applies to him. If the ten-year bar under § 1229c(d)(1)(B) applies, it will not expire until 2012 and the motion here was not available to him. If § 1229c(d)(1)(B) does not apply, Toufighi was still bound by the usual ninety-day deadline for motions to reopen, which ran long before he applied for a change of status.[7] *See* 8 C.F.R. § 1003.2(c)(2); 8 U.S.C. § 1229a(c)(7)(C)(I). The Board noted both grounds in its opinion. We need not determine whether the former ground is correct, because Toufighi's motion was rightly rejected on the latter ground, namely, it was barred by the usual ninety-day deadline.[8]

B. Motion to Reopen based on Changed Circumstances

Alternatively, Toufighi argues that new and verified evidence of changed conditions within Iran supports his claim of a well-founded fear of persecution. This ground is not subject to the ninety-day limitation discussed above. *See* 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii). Nor does the ten-year bar apply, because it does not bar an alien from seeking relief under 8 U.S.C. § 1231(b)(3) (withholding of removal) or 8 U.S.C. § 1158 (asylum). 8 U.S.C. § 1229c(d)(1)(B). The Board was therefore permitted to con-

---

[7]We recognize that the ninety-day time limit is not jurisdictional and that in a proper case equitable tolling might apply. *See Socop-Gonzalez v. INS*, 272 F.3d 1176, 1193 (9th Cir. 2001) (en banc). Toufighi did not present an equitable tolling claim to the Board and points to no facts in the existing record that might support such a claim.

[8]Toufighi also argues that the Board ignored his request to reopen *sua sponte*. We lack jurisdiction to review the Board's refusal to reopen removal proceedings *sua sponte. Ekimian v. INS,* 303 F.3d 1153, 1160 (9th Cir. 2002).

sider Toufighi's changed circumstances claim filed well over ninety days after the original order became final.

(1) The Board did not err as a matter of law when it concluded that Toufighi failed to establish that he would be persecuted for being a Christian.

[2] The Board found that the newly available evidence presented by Toufighi relating to persecution of Christians in Iran was irrelevant because the IJ had already determined that Toufighi had not converted to Christianity.[9] Toufighi argues that the Board's determination was in error because the IJ never rejected his assertion that he had converted to Christianity, and if the IJ did, the rejection was legally and factually in error. We find that the IJ did reject Toufighi's assertion of conversion, and that we now lack jurisdiction to review the IJ's original determination, because Toufighi's opportunity to appeal that determination lapsed ninety days after the Board's Order of May 21, 2002. The Board therefore did not err as a matter of law in relying on this conclusion.

a) The IJ made an express credibility finding rejecting Toufighi's assertion that he had converted to Christianity.

Toufighi asserts that the IJ did not make an express adverse finding regarding his credibility, and that the Board therefore erred in its reliance. In Toufighi's view, the Board misunderstood the IJ's decision. Toufighi submits that the IJ found him generally credible, and that the IJ's qualifying remarks[10] do

---

[9]Toufighi did not present new evidence or arguments in support of his alleged conversion with his motion to reopen. Rather, the evidence related solely to the deteriorating conditions in Iran for those associated with the United States or pro-Western ideology. *See supra* note 5.

[10]The IJ expressed "deep concern" as to genuineness of conversion; "serious doubt" as to conversion; and found the alleged conversion was merely "a vehicle for him to apply for political asylum in the United States." The IJ further stated that "[t]he Court just would not believe that the respondent's claimed conversion is genuine in nature." *See supra* p. 16376-77.

not add up to a clear finding that Toufighi's claim of conversion was false. Toufighi asserts that the only fair conclusion to be drawn is that the IJ had doubts, but resolved them on balance in Toufighi's favor, concluding that Toufighi had converted to Christianity but could avoid persecution by practicing his faith in hiding in Iran.[11]

[3] We disagree. Words may not be interpreted in a vacuum. It is context that gives meaning to words. Given the IJ's qualifying remarks, we conclude that the Board reasonably interpreted the IJ's decision as an explicit or express rejection of Toufighi's claim to have converted to Christianity.[12] On this record we find that the IJ did make an express adverse credibility determination as to Toufighi's claim that he converted to Christianity. *See Rizal v. Gonzales,* 442 F.3d 84, 89-90 (2d Cir. 2006) (finding an express adverse credibility determination on a similar record). The IJ did far more than imply a negative credibility finding by concluding that the applicant failed to satisfy the burden of proof. The IJ explicitly stated, "The Court just would not believe that the respondent's claimed conversion is genuine in nature. The Court

---

[11]The law of this circuit is clear that a finding that an applicant would have to practice her faith in hiding would support, not defeat, her application for asylum. *Zhang v. Ashcroft,* 388 F.3d 713, 719-20 (9th Cir. 2004). However, taken in context, the IJ's questions and comments along this vein were focused on imputed Christianity. The IJ merely intended to convey that the Iranian authorities would not impute Christianity to Toufighi because Toufighi had never practiced Christianity in Iran, and would cease the ruse of practicing it in the United States with the closing of the asylum proceedings. More importantly, as discussed *infra,* even if this had been the basis of the IJ's ultimate conclusion, we lack jurisdiction to review the IJ's decision.

[12]There is no inconsistency between a finding of general credibility where interest and bias were not significant, and partial non-credibility about the central claim of conversion. It appears that Toufighi wants very much to stay in this country. While Toufighi could have made a number of claims in support of asylum, he elected to claim a religious conversion. Stuck with that choice, he made the best effort he could to support it. The IJ found his claim of conversion false.

would find that the respondent's alleged conversion from Muslim to Christianity is basically as a vehicle for him to apply for political asylum in the United States." *Cf. Mansour v. Ashcroft*, 390 F.3d 667, 671-72 (9th Cir. 2004) (holding that an IJ's statements that he was "troubled by [ ] certain inconsistencies" and that the petitioner's credibility was "suspect" amounted only to "an implicit adverse credibility determination," which the court "refused to recognize"); *Kataria v. INS,* 232 F.3d 1107, 1114 (9th Cir. 2000) (holding that the Board did not make an adverse credibility finding when it "merely noted questions about [the petitioner's] claim and concluded that [the petitioner] failed to meet his burden of establishing asylum eligibility").

b) We do not have jurisdiction to review the IJ's conclusions.

Alternatively, Toufighi has argued that if the IJ did reject his conversion to Christianity, the IJ's finding was also in error. Although we have jurisdiction to hear this petition, our jurisdiction is limited to review of the Board's Order of July 15, 2004, denying the motion to reopen. We are not permitted to review the Board's Order entered May 21, 2002, dismissing Toufighi's appeal of the IJ's decision, because Toufighi failed to seek timely review of that order.

**[4]** The Supreme Court has held that a timely motion for reconsideration does not toll the running of the ninety-day period for review of final deportation orders. *Stone v. INS*, 514 U.S. 386, 405-06 (1995). By reasonable extension, a motion to reopen would also not toll the ninety-day period. *See, e.g., Martinez-Serrano v. INS*, 94 F.3d 1256, 1257-58 (9th Cir. 1996); *Caruncho v. INS*, 68 F.3d 356, 360 (9th Cir. 1995). Toufighi's opportunity to appeal the original denial of his application lapsed ninety days after the Board's Order of May 21, 2002.

**[5]** Because Toufighi's motion to reopen was not filed until October 16, 2003, the IJ's factual determinations in the original proceeding are conclusive. We consider only whether the alien satisfied the procedures, and presented a prima facie case for asylum based on the newly available evidence in light of the evidence presented in the original proceedings. *See Bhasin*, 423 F.3d at 984, 986 n.3.[13]

Toufighi seeks to avoid this result, asserting that the original decision of the IJ may be reviewed at this time because the Board rested its decision to dismiss his motion to reopen on the IJ's conclusions of fact. Citing *Ma v. Ashcroft*, 361 F.3d 553 (9th Cir. 2004), Toufighi argues that the Board's reliance on the IJ's original factual conclusion that Toufighi had not converted to Christianity necessarily opened up the earlier decision for review.

**[6]** Toufighi's reliance on this case is misplaced. *Ma* dealt with a motion for *reconsideration* of an earlier decision, not a motion to reopen. *Ma*, 361 F.3d at 558 n.7. A motion to reconsider necessarily reaches the prior decision because it must "specify[ ] the errors of fact or law in the prior Board decision." *See* 8 C.F.R. § 1003.2(b)(1). In contrast, a motion

---

[13]We have held that an alien may use a motion to reopen to present newly available material evidence that challenges the original factual conclusions drawn by the IJ. *Bhasin*, 423 F.3d at 985-86. However, a court may not directly review the original denial of asylum on a motion to reopen. *Id.* at 986 n.3. The applicant must demonstrate that the new evidence, when considered together with the evidence presented in the original asylum proceeding, would establish a prima facie case for asylum. *Id.* In *Bhasin*, the IJ based his conclusion that the applicant's would-be persecutors were not motivated by her membership in her familial social group on evidence that her family members still residing in the country of origin had not been persecuted. *Id.* at 985. In her motion to reopen, the applicant presented evidence that since the hearing before the IJ, three or more of her family members had been disappeared. *Id.* The court in *Bhasin* did not directly review the fact finding in the original asylum proceeding, it merely found that the facts had changed since the hearing. *See id.* at 985-86. Toufighi did not present new evidence of his conversion.

to reopen based on changed conditions is focused on "new facts" showing changed conditions that now establish a prima facie case for asylum. *See* 8 C.F.R. § 1003.2(c)(1) and (c)(3)(ii); *Bhasin*, 423 F.3d at 984-86. While a motion for reconsideration necessarily brings up the earlier order to be reconsidered, a motion to reopen engages the earlier order only to the extent the relevant available facts have since changed. *Id.*

c) The Board did not abuse its discretion.

In order to prevail on his motion to reopen the proceedings on the basis of changed country conditions, Toufighi needed to clear four hurdles: (1) he had to produce evidence that conditions had changed in Iran; (2) the evidence had to be "material;" (3) the evidence must not have been available and would not have been discovered or presented at the previous proceeding; and (4) he had to "demonstrate that the new evidence, when considered together with the evidence presented at the original hearing, would establish prima facie eligibility for the relief sought." *See* 8 U.S.C. § 1229a(c)(7)(C)(ii); *Bhasin*, 423 F.3d at 984. The Board could thus deny the motion to reopen for failing to meet any of these burdens. *See Abudu*, 485 U.S. at 104-05.

**[7]** In this case, the Board concluded that the evidence produced by Toufighi with his motion to reopen, did not "contain[ ] *prima facie* evidence that the respondent would be directly affected by *any* changes noted therein." Even assuming the newly available evidence presented by Toufighi demonstrated a general increase in persecution of apostates in Iran, Toufighi still failed to establish a prima facie case for eligibility because it had already been conclusively determined that he was not an apostate, and that Iranian officials would not impute this status to him because Toufighi would never inform them of apostasy which never took place.[14] The

---

[14]The dissent argues that neither the IJ nor the Board considered imputed group membership. Though he did not use the term "imputed,"

IJ's conclusive findings on this point also make the new evidence regarding persecution of apostates immaterial.

**[8]** In conclusion, because the IJ found the conversion was not genuine, and that apostasy would not be imputed to Toufighi, the Board did not abuse its discretion in concluding that his evidence of changed country conditions was not "material" to his claim, and that he failed to establish a prima facie case for asylum.

(2) The Board did not err in failing to consider other possible bases for reopening.

On appeal, Toufighi argues that the Board abused its discretion by confining his motion to reopen to issues of religious persecution. He argues that the Board should have addressed a claim that Toufighi was exposed to persecution based upon his association with the United States, pro-American opinion, and his new wife and children who are United States citizens. In Toufighi's view, anyone identified in the Iranian mind with the United States or pro-American ideology will be at risk because of the recent escalation of

---

the IJ addressed this concern, concluding that Toufighi would not be viewed as a Christian in Iran. The IJ noted that Toufighi had never been persecuted in Iran; had never practiced Christianity in Iran; had almost no ties to Christians in Iran; and would not communicate his alleged conversion upon return to Iran because it was merely a ruse to gain asylum. In light of the IJ's factual determinations that Toufighi was not a genuine convert to Christianity, was not an apostate, and would not be considered an apostate by the Iranian authorities, and given our lack of jurisdiction to review these factual determinations, we do not reach the separate question whether a petitioner could establish a well-founded fear of persecution based on evidence of apostasy, or evidence that the petitioner would be perceived as an apostate by Iranian officials, in a case where the petitioner failed to prove that the petitioner's conversion was genuine. *Cf. Najafi v. INS*, 104 F.3d 943, 949 (7th Cir. 1997) (noting that evidence regarding the "sincerity of the alien's new religious commitment" can be relevant to an asylum claim based on apostasy, but is not dispositive).

tensions brought on by war in Iraq and the tussle over Iran's plan to develop nuclear capability.

The Board did not recognize this as a separate claim. It was not required to search the record to tease out claims that Toufighi had not clearly made. The claims Toufighi had previously made were focused on his religious beliefs and how those beliefs would be viewed in Iran. He does not contend that he was active in pro-Western groups before coming to this country. He never claimed to be affiliated with anti-Iranian-government or pro-Western groups in this country. We have never recognized pro-Western as a social group protected against persecution, and agree with the Seventh Circuit that such a proposition "is debatable at best." *Sharif v. INS*, 87 F.3d 932, 936 (7th Cir. 1996); *see also Fisher v. INS,* 79 F.3d 955 (9th Cir. 1996) (en banc).

**[9]** In sum, the Board did not act unreasonably in not separately addressing a claim that Toufighi had a well-founded fear that he would be persecuted based upon his political opinions or membership in a pro-Western or pro-American social group.

## CONCLUSION

The Board denied Toufighi's motion to reopen his case. It held that Toufighi's motion to reopen to adjust his status based on marriage to a United States citizen and the birth of their citizen children could not be considered because the motion was untimely and barred by civil penalties assessed against Toufighi for failing to depart as ordered. As to Toufighi's request to reopen in light of changed circumstances in Iran, the Board, in reliance on the IJ's conclusion that Toufighi had not converted, and would not be identified as having done so, concluded that the evidence presented was not relevant, and that he failed to establish a prima facie case for asylum. These decisions of the Board did not constitute an abuse of discretion and were supported by substantial evidence.

**PETITION DENIED**.

---

BERZON, Circuit Judge, dissenting:

I respectfully dissent. The BIA misunderstood what the IJ actually said about Toufighi's conversion and, as a result, entirely failed to consider whether circumstances have changed with regard to how Iran treats apostates.[1] The majority opinion perpetuates the BIA's error.

The BIA declined to consider Toufighi's new evidence because:

> [T]he Immigration Judge [IJ] previously rejected the respondent's assertion that he had converted to Christianity; the respondent's religious conversion was the basis of his claims. To the extent that this information would relate to persecution of Christians in Iran, the respondent has already failed to establish that this would affect him.

The majority upholds the BIA because it also concludes that the IJ found that "the conversion was not genuine, and that [therefore] apostasy would not be imputed to Toufighi." Maj. Op. at 10896.

But the IJ did *not* find that Toufighi had not converted, only that his conversion was not *spiritually* genuine.[2] The IJ found

---

[1]Toufighi submitted documents demonstrating that the climate of repression in Iran is worsening for Muslims who have renounced Islam. Whether or not the evidence was adequate to support reopening is properly a question for the BIA on remand.

[2]The majority is correct that we lack jurisdiction to review the IJ's decision. The IJ's findings of fact cannot be disturbed at this point. But we do not, of course, lack jurisdiction to read the opinion carefully to discern what the IJ did and did not say.

"first of all, the respondent's testimony to be generally credible," but went on to "note that he has very deep concern as to the *genuineness* as the [sic] respondent's claimed conversion from Muslim [sic] to Christianity" and that he "just would not believe that the respondent's claimed conversion is *genuine* in nature." (emphases added). Instead, he found, "the respondent's alleged conversion from Muslim [sic] to Christianity is basically a vehicle for him to apply for political asylum in the United States."

At the same time, however, the IJ *credited* Toufighi's testimony that he was a church member, "attending Christian church every Sunday, for four hours each day, for at least the last year-and-a-half" and that he attended a small prayer group every Tuesday. The IJ also found that Toufighi would continue to practice his Christian beliefs in Iran, as he credited Toufighi's statement that "if he were to return to Iran, he would only practice his religion in hiding."[3]

So the IJ's finding was only that the conversion might not be "genuine" — that is, not spiritually in earnest. The BIA elided the distinction between this finding and a finding that there had been no conversion, in the sense of behavior and practice, when it stated that "the [IJ] previously rejected the respondent's assertion that he had converted to Christianity."

---

[3]To the extent the BIA relied on this finding to determine that changed conditions would not affect Toufighi, its holding was, as the majority recognizes, improper. "[T]o require [a petitioner] to practice his beliefs in secret is contrary to our basic principles of religious freedom and the protection of religious refugees." *Zhang v. Ashcroft*, 388 F.3d 713, 719 (9th Cir. 2004). On a more pragmatic level, "[a]s for the suggestion that the Iranian authorities may not discover [Toufighi's] aspostasy, . . . the INS [and now the DHS] apparently makes no effort to conceal its deportation and asylum proceedings from foreign states." *Bastanipour v. I.N.S.*, 980 F.2d 1129, 1133 (7th Cir. 1992).

The majority resolves this problem by arguing that the IJ *really* just "intended to convey that the Iranian authorities would not impute Christianity to Toufighi because he "would cease the ruse of practicing it in the United States with the closing of the asylum proceedings." The IJ did not say that.

The BIA's oversight is critically important. The question for asylum purposes is not what Toufighi believes in his heart of hearts, but whether he would be perceived as having renounced Islam were he to return to Iran. The threat to the petitioner upon return would stem not from what he really believes, but from what his persecutors would understand him to believe. By missing the distinction, the BIA failed to consider whether changed circumstances bear upon this threat.

We have recognized the distinction between actual and imputed belief in the political opinion context: "To establish a likelihood of persecution on account of an imputed political opinion, an applicant must show that his alleged persecutors have imputed or would impute a political opinion to him, 'rightly or in error,' and have persecuted or would persecute him for that opinion." *Al-Harbi v. I.N.S.*, 242 F.3d 882, 890 (9th Cir. 2001) (quoting *Sangha v. I.N.S.*, 103 F.3d 1482, 1489 (9th Cir. 1997)); *see also Mejia v. Ashcroft*, 298 F.3d 873, 877-78 (9th Cir. 2002) (discussing imputed political opinions). In *Al-Harbi*, for example, we upheld the BIA's conclusion that the Iraqi petitioner was *not* an anti-Hussein activist, and had lied when he said he was. 242 F.3d at 889-90. But given the circumstances in Iraq at the time, and his involvement in an American-sponsored escape from Iraq, we held he would be treated upon return as an American loyalist and opponent of Hussein, even though he was not. *Id.* at 890-94.

An imputed religious opinion is treated the same way, particularly in theocratic Iran where religion *is* politics. We have recognized that the Iranian government may persecute people for their "actually-held *or* perceived-to-be-held political or religious beliefs." *Fisher v. I.N.S.*, 79 F.3d 955, 962 (9th Cir. 1996) (en banc) (emphasis added); *see also Abedini v. U.S. I.N.S.*, 971 F.2d 188, 192 (9th Cir. 1992) (discussing the possibility of persecution if Iranian government would "impute a political or *religious* belief" to the petitioner) (emphasis added). Other circuits have also so held in the religion con-

text. *See Rizal v. Gonzales*, 442 F.3d 84, 90 n. 7 (2nd Cir. 2006) ("Indeed, even an individual who does *not* subscribe to a certain religion, but is nonetheless being persecuted on account of others' perception that he does, may well be able to establish a religious persecution claim under a theory of 'imputed religion' analogous to the 'imputed political opinion' theory . . . .") (emphasis in original)[4]; *Mezvrishvili v. U.S. Attorney General*, 467 F.3d 1292, 1296 (11th Cir. 2006) (same); *Ahmadshah v. Ashcroft*, 396 F.3d 917, 920 n. 2 (8th Cir. 2005) (holding that, in the case of a Muslim apostate applying for asylum from religious persecution in Afghanistan, "[e]ven if [petitioner] did not have a clear understanding of Christian doctrine, this is not relevant to his fear of persecution. . . . If [petitioner] had shown that Afghans would believe that he was an apostate, that is sufficient basis for fear of persecution under the law.").

As *Ahmadshah* and a line of earlier well-reasoned Seventh Circuit cases make clear, the BIA particularly missed the point in the case of a Muslim apostate who fears persecution under religious law. "The offense in Muslim religious law is apostasy — abandoning Islam for another religion," not the sincerity of faith in the new religion. *Bastanipour v. I.N.S.*, 980 F.2d 1129, 1132 (7th Cir. 1992); *see also Najafi v. I.N.S.*, 104 F.3d 943, 948 (7th Cir. 1997) (IJ "treated the question of whether [petitioner] is a Christian as dispositive of his claim of religious persecution [but] . . . . [r]ather we must ask whether the alien is an apostate.").

In short, the question is *not* what Toufighi believes but what Iran understands him to believe — or, more accurately,

---

[4]Indeed, in *Rizal* the IJ found that the petitioner had "failed to persuade the Court of the *genuineness* of his professed Christian faith," 442 F.3d at 88 (emphasis added), much as in this case. While that case was resolved on other grounds, *Rizal* endorsed a distinction between "genuine" faith and the imputed religious opinions that may put asylum seekers at risk and which threaten Toufighi here. *Id.* at 90 n. 7.

*not* to believe. It is throughly plausible that because he attends
Christian services and belongs to a Christian church, Toufighi
will be taken to have renounced Islam. Neither the BIA's nor
the IJ's "opinion[s] . . . consider[ed] what could count as con-
version in the eyes of an Iranian religious judge, which is the
only thing that *would* count as far as the danger to [the peti-
tioner] is concerned." *Bastanipour,* 980 F.2d at 1132 (empha-
sis in original). Even if his conversion is not "genuine," he
remains at risk. "Whether [the petitioner] believes the tenets
of Christianity in his heart of hearts or, . . . is acting oppor-
tunistically (though at great risk to himself) in the hope of
staving off deportation would not . . . matter to an Iranian reli-
gious judge." *Id.*; *cf. Al-Harbi*, 242 F.3d at 890-94.[5]

The IJ's sincerity findings were therefore entirely unre-
sponsive to the critical question before the BIA on Toufighi's
religious asylum ground. For these reasons, the BIA's holding
on the religious persecution/change of country circumstances
question was unsupported. Because the majority, like the
BIA, misreads the IJ as holding that Toufighi was not and is
not a Christian, in any sense, it concludes that he is therefore
"not an apostate" and so fails to recognize the BIA's error.
Maj. Op. at 10896.

It is important to note, however, that, because of its misun-
derstanding of the IJ's opinion, the majority does *not* hold that
imputed religious beliefs in general or apostasy in particular
are improper grounds on which to base an asylum claim.
Instead, it simply fails to grasp that the sincerity of Toufighi's
beliefs has no direct bearing on the question whether he will
be persecuted based on imputed religious beliefs.

---

[5]For this reason, the IJ's belief that Toufighi's conversion was moti-
vated by a desire to seek asylum is largely irrelevant to the changed cir-
cumstances inquiry. If the external incidents of conversion were
sufficiently obvious as to suggest that he had left Islam, he could well be
in danger in Iran, even if his initial motivations were impure.

Starting from false premises, the majority reaches an unjust result. A remand to reconsider Toufighi's motion to reopen upon proper legal standards would have been the appropriate course.

I respectfully dissent.